|1THIBODEAUX, Judge.
On September 9, 1990, Thomas W. Silman, the defendant, shot and killed his father, Thomas H. Silman; his brother-in-law, James “Danny” Lewis; his sister, Carolyn Silman Lewis; and, his uncle, Conley Kermit Allen, at Silman’s residence in Montgomery, Grant Parish, Louisiana. The defense stipulated the defendant fired the shots which killed the above victims.
The defendant was indicted for four counts of first degree murder. Upon stipulation that the state would not seek the death penalty, the defendant waived his |2right to a trial by jury and agreed to a bench trial. The trial court ordered a sanity commission to evaluate the defendant. The sanity commission determined the defendant was competent to. proceed to trial and could assist counsel in preparing his defense. Each member of the sanity commission, Drs. Paul Ware, Joe B. Hayes, and James D. Calvert, agreed the defendant was legally insane at the time of the offenses.
The sole issue at trial was whether the defendant was legally insane at the time of-the offenses.
After a lengthy trial, Judge Lloyd Teekell found the defendant not guilty for the killing of defendant’s father, Thomas H. Silman, and found the defendant guilty as charged for the ■killing of Danny Lewis, Carolyn Silman Lewis, and Kermit Allen. The defendant was sentenced to three concurrent life sentences at hard labor, without benefit of probation, parole, or suspension of sentence.
The defendant appeals to this court, alleging two assignments of error.

ISSUES

The issues presented for review are:
*812 1) Whether the evidence is insufficient to show beyond a reasonable doubt that the defendant did not prove by a preponderance of the evidence that he was legally insane at the time of the killings.
2) Whether the trial court erred in denying the defendant’s motion for post verdict judgment of acquittal.
For the following reasons, we conclude that the trial court’s verdict on the issue of the defendant’s sanity was erroneous. We, therefore, reverse Thomas Silman’s convictions and sentences and remand to the trial court. Our decision preempts discussion of any alleged errors in the denial of defendant’s motion for post verdict judgment of acquittal.

|3LAW & ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

A. The Defendant’s Psychiatric/Psychological Evidence

The members of the court-appointed sanity commission, Dr. Paul Ware, Dr. Joe B. Hayes, and Dr. James D. Calvert, all examined the defendant within ninety days of the shootings. Each member of the sanity commission concluded the defendant was mentally competent to proceed to trial and to assist his counsel in the preparation of his defense.
Each member of the sanity commission also found the defendant was legally insane at the time of the offenses, and unable to distinguish between right and wrong in reference to the conduct in question.
Sanity commission members, Dr. Ware and Dr. Hayes diagnosed the defendant’s mental illness as schizotypal personality disorder. Dr. Ware testified schizotypal personality disorder is the most serious of the permeating personality disorders. Dr. Calvert initially diagnosed the defendant as having a borderline personality disorder. Like the schizotypal disorder, a borderline personality predisposes a person to reactive psychotic episodes in response to stress. Borderline personality disorder and schizotypal personality disorder have many overlapping characteristics and are often indistinguishable.
Defense experts, Dr. Louis Cenac and Dr. Stuart Kutz, also diagnosed the defendant’s mental illness as schizotypal personality disorder when they examined the defendant two and one-half years later. According to the members of the sanity commission and to the defense experts, a person with schizotypal personality disorder is predisposed to become psychotic under stress.
|4All but one of the mental health experts who examined the defendant referred to the DSM-III-R to diagnose the defendant’s problem. The DSM-III-R is a diagnostic manual of mental disorders used by nearly all mental health professionals. The book is recognized as authoritative for diagnostic purposes. The DSM is continually revised and updated as the mental health field changes and grows. The manual promotes uniformity by establishing various diagnostic criteria for enumerated illnesses, resulting in more accurate and more conservative diagnoses.
Nine diagnostic criteria define schizotypal personality disorder: 1) ideas of reference; 2) excessive social anxiety; 3) odd beliefs or magical thinking; 4) unusual perceptual experiences; 5) odd or eccentric behavior or appearance; 6) no close friends or contacts; 7) odd speech; 8) inappropriate or constricted affect; and 9) suspiciousness or paranoid ideation. A patient must exhibit at least five of these symptoms to be diagnosed with this illness. According to the sanity commission and the two defense experts, the defendant displayed most of the above criteria.
Individuals with this disorder are pre-psy-chotic, with a disorganized personality, an inability to cope, and there is always the possibility they will explode under pressure. Defense counsel argues the arrival of Carolyn and Danny Lewis at the Silman home on September 9, 1990, triggered a psychotic reaction in the defendant.

B. The State’s Psychiatric/Psychological Evidence

The state experts, Dr. Kenneth A. Ritter and Dr. Fred E. Davis, agreed the defendant was competent to proceed to trial and could assist his attorney in his defense. However, *813 Dr. Ritter and Dr. Davis did not agree with the other experts’ finding that the defendant was legally insane at the time of the offense.
|5Pr. Ritter testified he did not believe in the existence of schizotypal personality disorder. Dr. Ritter also testified he did not recognize the DSM-III-R as a valid diagnostic tool or learned treatise in the field of psychiatry. He said the DSM-III-R is only an attempt by the American Psychiatric Association to increase his profession’s respectability in the scientific community. Dr. Rit-ter could not imagine any stress sufficient to cause the defendant to become psychotic, because Dr. Ritter did not believe in the disease which would predispose the defendant to psychotic episodes, although all of the other six experts noted the presence of this mental illness.
While Dr. Ritter testified the defendant met all but three of the criteria for schizotypal personality disorder, Dr. Ritter diagnosed the defendant as having schizoid personality disorder. The schizotypal personality disorder blends with schizoid personality, and there is no reason to extend the diagnosis any further. A schizoid personality is a term used to describe the classic introvert, and is not the equivalent of a mental disease or defect indicative of legal insanity. Dr. Ritter admitted the diagnosis of schizoid personality disorder versus schizotypal personality disorder was subject to varying interpretations in the field of psychiatry.
Dr. Ritter emphasized the defendant’s lack of prior psychiatric problems and stable work history were more important than any kind of psychological testing. Dr. Ritter found the defendant exhibited a jealous rage, and he did not have a psychotic episode. Dr. Ritter testified the defendant’s attachment to his sister and his seething jealousy of her were abnormal. He said the defendant denied having auditory hallucinations; and, according to Dr. Ritter, the defendant’s hearing his name called was not a hallucinatory experience. Dr. Ritter testified the defendant could distinguish right from wrong, but his feelings boiled out of control. He based his I |6findings on the defendant’s decision not to shoot his mother, the defendant’s efforts to evade the police, the defendant’s surrender without a weapon, and the defendant’s request for an attorney when he surrendered.
The other state expert, Dr. Davis, a psychologist, evaluated the defendant using a standard which allowed a finding of legal insanity only if he could conclude with ninety percent certainty that clear and unmistakable data supported his conclusion. Applying this ninety percent rule to the insanity test, Dr. Davis testified he understood the elements to be: 1) the defendant had a disease of the mind; 2) the defendant had a defect of reason (a marked loss of the ability to think logically and factually weigh alternatives and make decisions; 3) the defendant did not know the nature and quality of his acts; and 4) the defendant did not know his acts were wrong.
Dr. Davis testified. a forensic evaluation differs from a psychiatric evaluation in a number of important, ways. A forensic evaluation requires clear and unmistakable data to support any conclusion that might be made. The primary difference is the rigorous standard of proof required to establish legal insanity, which Dr. Davis said was proof with ninety percent certainty. Dr. Davis explained he required a ninety percent certainty rule for forensic examinations because of the profound consequences for all parties involved. He testified a doctor’s misdiagnosis in a hospital situation was easily corrected.
According to Dr. Davis, the data did not support the defendant’s claim of psychosis on the day of the killings or at any other time. He found some information which suggested the defendant was psychotic on the day of the shootings, but none of the information was sufficient to satisfy his ninety percent certainty rule. He could not find clear, unmistakable evidence of a psychotic disturbance.
|7While his initial report indicated schizo-typal personality disorder as a possible diagnosis, at trial Dr. Davis testified the defendant was depressed and had a deteriorating personality disorder. In his opinion, most of the deterioration took place after the defendant was in jail.
*814 Dr. Davis found the defendant could distinguish between right and wrong at the time of the killings, and was aware of the consequences of his actions. The defendant told a family member he would kill his sister if he did not have to spend a long time in the penitentiary. The defendant kept police at bay. The defendant chose not to shoot his mother. According to Dr. Davis, these actions signify the defendant’s fundamental sense of right and wrong.
Dr. Davis found the defendant’s hearing his name called was not a full-blown hallucinatory experience. The defendant’s belief that Danny Lewis was black was not a delusion, but part of his family’s belief system. The defendant’s pressured speech and explosive laughter were a response to the tension of the psychological evaluation. Dr. Davis found the defendant did exhibit some strange behavior, such as his attempt to awaken his dead father to have dinner with him and his unusual preoccupation with his appearance. However, he said these actions were related to the defendant’s personality disorder, and were not examples of bizarre or disorganized behavior. Dr. Davis did find the defendant had social anxiety and depression.
While we believe Dr. Davis was sincere in his beliefs and methodology, he simply used the wrong standard in reaching his conclusion. He candidly admitted that:
“Well, I think my thinking in this case is guided by perhaps a different uh, uh, set of guidelines. First of all I said that I require a ninety percent certainty in order to conclude that. That’s a pretty rigorous standard. And others who are doing these evaluations, uh, may not adopt that standard in their thinking. May not require of their data that it meet |8that standard. Um, I also begin with the premise that we must satisfy McNaughton. We must meet the standard laid down by McNaughton. We must be able to conclude with ninety percent certainty that there was a disease of the mind.”
Dr. Davis testified the defendant did not qualify for the defense of insanity under his version of the test. The defendant may have exhibited an involuntary lack of control, but Dr. Davis did not find strong evidence of a disease of the mind. When questioned by the trial judge, Dr. Davis said he could not evaluate the defendant’s mental health under a less rigorous standard than his ninety percent certainty rule.
Dr. Davis subjected the defendant to an insanity test with more elements than required by Louisiana law. Then Dr. Davis evaluated these findings using a ninety percent certainty l’ule which he himself admitted was rigorous.
The central issue in the state’s brief to this court discussed whether mental health experts should be allowed to address the question of legal insanity. According to the state’s brief, mental health experts’ testimony should not be allowed until the science is capable of determining with legal certainty whether someone suffers from a particular mental disorder. At oral argument, the state again emphasized the unreliability of medical and scientific evidence on the issue of insanity. The state also admitted that most sanity commissions, in the vast majority of cases, unanimously agree that an accused is sane and much credence is placed on this finding. It seems incongruous to us that reliance on medical and scientific evidence is acceptable when it is favorable to the state’s position, but somehow unacceptable when the state’s viewpoint is rejected.
|9None of the experts, for the state or for the defense, found any evidence that the defendant was malingering; or exaggerating his condition. Over the two and one half year period before trial, all of the defendant’s test results were consistent.

C. Lay Testimony

Silman’s mother testified that he did not participate in normal childhood activities and was not able to function within society to an extent exceeding a merely shy or introverted person. He lived with his parents all of his life, except for two years of military service, and had no friends outside his family. The defendant never had a romantic relationship beyond an occasional one night stand. Sil-man was extremely protective of his younger sister, Carolyn, and always exhibited a parental protectiveness toward her.
*815 As an adult, the defendant was shy, reclusive and overly concerned with his teeth and losing his hair. Even when facing the death penalty, Silman said his greatest worry was the loss of his hair. Over the past ten years, he would hear his name called and then discover no one was there. He exhibited little emotion or expression. The defendant worked for fifteen years in a machine shop, usually for 45 to 50 hours in a 'six or seven day work week.
Except for his sister, Carolyn, Silman had no friends at all as an adult, according to his mother and others. The experts testified the defendant would have probably resented a relationship between Carolyn and any man; but her marriage to their dark skinned first cousin, Danny Lewis, was more than Silman could bear. He believed Danny Lewis was Black, despite the fact that Danny Lewis’s father was White and his mother was Hispanic. Carolyn’s marriage, he felt, disgraced him and caused the entire community to laugh at him when he went out in public.
|10Puring the year following Carolyn’s marriage to Danny, Silman became more depressed. He destroyed every reminder of his sister. The defendant spent even more time alone, began to drink at work, and had trouble sleeping.
Silman had sketchy memories of the events leading to the homicides and of the killings. The defendant’s mother testified he was “crazy” and “just went wild.” When he went to the door with his shotgun, his father attempted to stop him. In the struggle, Sil-man shot his father. After shooting the other three family members, he returned to the house, and attempted to awaken his dead father to have supper with him.
After the homicides, when the police surrounded the house, Silman showered and changed clothes before surrendering. When he surrendered to the police, Silman said, “What’s the big deal?” State Police Sergeant Darrell Guillory testified the defendant seemed unaware of what was happening when he surrendered. Sergeant Guillory said he actually wondered if the person he was arresting was the defendant. Alexandria Police Captain Edward L. Christie described Silman as almost catatonic, and testified he had never seen a suspect who seemed so detached under the circumstances.

D. The Legal Standard

In Louisiana, a defendant is presumed to be sane, and the state is not required to prove his sanity. La.R.S. 15:432. A defendant who wishes to negate the presumption must put forth the affirmative defense of insanity and prove his insanity by a preponderance of the evidence. La.Code Crim.P. art. 652; State v. Claibon, 395 So.2d 770 (La.1981); State v. Roy, 395 So.2d 664 (La.1981).
|11The defendant must show he suffered from a mental disease or defect which rendered him incapable of distinguishing between right and wrong with reference to the conduct in question. La.R.S. 14:14; State v. Roy, supra.
In reviewing a claim of insufficiency of evidence in regard to a defense of insanity, the relevant inquiry by a reviewing court is whether the defendant adduced evidence of his insanity at the time of the offense such that any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Claibon; State v. Roy, supra. This determination is made after reviewing all of the evidence contained within the record, including expert and lay testimony. The fact finder should consider both expert and lay testimony given and then determine whether the defendant has successfully rebutted the presumption that he was sane at the time of the offense. State v. Parker, 416 So.2d 545 (La.1982); State v. Guidry, 450 So.2d 50 (La.App. 3rd Cir.1984).
We find the defendant successfully rebutted the presumption of his sanity at the time of the offenses. Viewing the evidence in the light most favorable to the prosecution, we find beyond a reasonable doubt that the defendant has proven, by a preponderance of *816 the evidence, his insanity at the time of the offense. The court-appointed sanity commission and two defense experts agree the defendant was legally insane at the time of the offenses. The lay testimony in the record supports the experts’ finding.
The state experts, Dr. Ritter and Dr. Davis, found the defendant was sane at the time of the offenses. However, Dr. Ritter testified he did not believe in the |12existence of defendant’s mental illness which was diagnosed by six other mental health experts. Dr. Davis applied a stringent ninety percent certainty rule to a test for insanity which contains more elements than specified in the statute. An expert’s opinion has no value if the premises on which he bases his conclusions are flawed.
We hasten to emphasize that we are not merely counting up experts to reach a conclusion. In evaluating the testimony of the medical and scientific experts, we note a similarity with a very recent Louisiana Supreme Court case involving the issue of insanity, State v. Peters, 643 So.2d 1222 (La. 1994). In affirming a reversal of a murder conviction on the basis of insanity, the court in Peters observed that the state presented no expert testimony to rebut the accused’s experts. While the state in this case presented the testimony of a psychiatrist and a psychologist, the value of their conclusions is highly questionable. As we have previously stated, Dr. Ritter, the psychiatrist, disclaims the scientific existence of Silman’s disorder and Dr. Davis, the psychologist, analyzed insanity using flawed bases. If these opinions are rejected as valueless, as we think they must, then what remains to be scrutinized is the testimony of the defendant’s experts and the lay testimony, both of which support a finding of insanity.
The Louisiana legislature has provided for and defined the defense of insanity. The Louisiana Supreme Court, on many occasions, has recognized insanity as a valid defense. This provision requires a defendant to rebut the presumption of sanity and prove his insanity by a preponderance of the evidence. We readily admit this standard is sometimes reluctantly applied and the decision we reach today is not an easy one. The difficulty in applying this facially straightforward standard is heightened by the tragic circumstances of this case. The dastardly acts of Silman are made even more egregious by his ethnic insensitivity which is concededly not easily |13ignored. Nonetheless, we have painstakingly reviewed the record and must apply the law, no matter how philosophically distasteful it may be. Candor compels us to acknowledge, however, that some individuals in our society may escape just punishment as a result of our staunch commitment to constitutional and statutory norms. Compliance with these norms on an occasion such as this one is not a pleasant duty; but it is a duty from which judges may not shrink.

CONCLUSION

Viewing the evidence in the light most favorable to the prosecution, the trial court verdict on the issue of sanity is contrary to the preponderance of the evidence. Consequently, a judgment of not guilty and not guilty by reason of insanity must be entered. The defendant’s conviction and sentence are reversed and vacated and this case is remanded to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SAUNDERS, J., dissents and assigns reasons.