663 So.2d 27 (1995)
STATE of Louisiana
v.
Thomas W. SILMAN.
No. 95-K-0154.
Supreme Court of Louisiana.
November 27, 1995.
*28 Richard P. Ieyoub, Attorney General, Baton Rouge, Edward L. Tarpley, Jr., Colfax, Daniel James Grady, III, Baton Rouge, for Applicant.
J. Michael Small, Phyllis Elaine Mann, Alexandria, for Respondent.
JOHNSON, Justice.[1]
Thomas W. Silman was indicted for four counts of first degree murder in the shooting deaths of his father, sister, brother-in-law, and uncle, in violation of La.R.S. 14:30. The defense stipulated that the defendant fired the fatal shots and agreed to waive the defendant's right to a jury trial upon stipulation by the state that it would not seek the death penalty. Defendant contends that the death of his father, Thomas H. Silman, was an accident, but defends the homicides of the other victims on the basis of insanity at the time of the crimes. Defendant was ordered to undergo examination by the court appointed sanity commission which determined that he was competent to stand trial. After weighing the expert and lay testimony, the trial judge found the defendant not guilty for the killing of his father, but concluded that the defendant was guilty as charged of the first degree murders of his sister, brother-in-law and uncle. The trial judge denied defendant's motion for new trial and motion for post-verdict judgment of acquittal. The defendant was sentenced to three concurrent life sentences at hard labor, without the benefit of probation, parole, or suspension of sentence. The court of appeal reversed the finding of the trial court, concluding that the verdict was contrary to a preponderance of the evidence. State v. Silman, 94-367 (La. App. 3 Cir. 11/9/94), 645 So.2d 810. We granted certiorari to determine the correctness of that conclusion. 95-0154 (La. 5/19/95), 654 So.2d 1093. After reviewing the record in its entirety, we reverse the decision of the court of appeal and reinstate the trial court's judgment.

FACTS
On September 9, 1990, while attending a gathering at the Silman family home in Montgomery, Louisiana, to celebrate the 80th birthday of his father, defendant, Thomas W. Silman, shot and killed his father, Thomas H. "Duck" Silman, his sister, Carolyn Silman Lewis, his brother-in-law, Danny Lewis, and his uncle, Kermit Allen. The evidence introduced at trial established that defendant had a fixation with his younger sister, Carolyn. The testimony revealed that defendant, as an adult, had no friends other than Carolyn. It was undisputed that the defendant would have probably resented a relationship between Carolyn and any man, but defendant was deeply troubled over his sister's marriage to Danny Lewis. Although defendant resented the marriage because Carolyn and Danny were first cousins, his primary reason for disapproval of the marriage was that he believed Danny, who was dark complexioned due to his Hispanic heritage, was an African American. The defendant often referred to Danny as a "nigger" or "half breed." During the year following Carolyn's marriage to Danny, Silman became more distraught and destroyed all mementos of his sister. He also made prior threats against Carolyn and Danny Lewis' lives. The horrific details surrounding the events that occurred on September 9, 1990, are as follows:
*29 "Duck" Silman's birthday party had not commenced prior to Carolyn and Danny Lewis' arrival at the Silman family home. As soon as the couple arrived, defendant got his shotgun and rushed toward the door to confront them. In one account, Silman reported that his father tried to talk to him and stepped in the way. His father then wrestled with him for the gun and when his father fell to the floor, he knew he had shot him. However, Silman later reported that his father was blocking the doorway in an attempt to prevent his going outside. He then shot his father in the stomach, but stated that he did not know why he shot him. Although the record is unclear as to the exact sequence of events that occurred afterwards, it is apparent that the defendant fatally shot his father in the chest.
Silman then walked outside where he fired a shot at Danny through the windshield of Danny's pickup truck, striking him in the right side of the chest. In an effort to stop the defendant, Carolyn grabbed the barrel of the shotgun. The shotgun discharged, striking her in the forearm. As Carolyn fell to her knees, the defendant then shot her in the right shoulder, causing her to fall to the ground. While lying on her back on the ground, the defendant placed the barrel of the shotgun inside his sister's mouth and pulled the trigger, shooting her a third time at point-blank range. Afterwards, the defendant walked around to the driver's side of the pickup truck and fired a second shot into Danny's chest. The defendant then placed the barrel of the gun to Danny's forehead and fired again, shooting him for the third time.
Shortly thereafter, Kermit Allen arrived at the Silman residence on foot. As he approached the house, defendant fired a shot at Allen, striking him in the upper legs. Silman then fired a second shot at Allen striking him in the chest. As Allen lay wounded on the ground, the defendant placed the gun barrel into the roof of Allen's mouth and fired a third shot.
The record indicates that Silman may have resented his uncle, Kermit Allen, and Allen's wife because they allowed Carolyn to park her trailer behind their grocery store after she moved out of the Silman family home, and they entertained both her and Danny in their home. Apparently, Silman felt that the Allens were meddling in his relationship with Carolyn. According to Mrs. Silman, on the day of the incident, Carolyn called her from the Allen's residence and asked, "was it safe for [her] to come over there," referring to defendant's hostility towards her.
The evidence further suggests that Silman could have, on numerous occasions, killed his mother, but chose not to. In fact, his mother testified that he displayed homicidal rage toward her sister, Mrs. Allen. When asked if her son tried to harm her, Mrs. Silman testified that,
AHe told me lay down on the floor and I didn't. I run out [sic], what did I do, oh I went to the phone and he threatened to kill my sister and I run [sic] to the phone to call her and he yanked the wire out of the wall.
QUm hum.
AAnd then he went out in the yard to shoot my daughter and while he was out there I run [sic] out there to help her, you know, cause [sic] they was [sic] wrestling with the gun, but he shot her before I could get there. So I run [sic] to Omatha's, I mean I had started [sic]. She was coming out of her house, her and her mother in law and I told them that [sic], I told Omatha to run and call my sister, Mrs. Allen, and tell her to lock her door and don't let him in and, but [sic] for none of them to come over there.
While the defendant was not tried for any other offenses surrounding his actions, the record indicates that subsequent to the shooting deaths of his father, sister, brother-in-law and uncle, defendant went back inside the family home and conducted a one and one-half hour standoff and shootout with law enforcement officers. At least forty-five law enforcement officers, along with helicopter overflights, surrounded the Silman family home. During the standoff, defendant fired several shots from a .20 gauge shotgun, two.22 caliber rifles and a .12 gauge shotgun at law enforcement officers and others, injuring three police officers and one civilian.
*30 At some point during the standoff, the defendant showered and changed his clothing. Afterwards, he walked outside unarmed and surrendered to the police. Sergeant Darrell Guillory of the Louisiana State Police testified that after he apprehended Silman, the defendant made two statements, both in a calm tone of voice. Defendant's first statement was "don't hurt me" and his next statement was "what's the big deal?" According to Sergeant Guillory, the defendant appeared oblivious to what was happening around him. Guillory stated that considering the events that had just occurred, defendant's second statement was "out of place." He further testified that he assumed he had apprehended the person responsible for the killings, but the calmness of defendant's voice prompted him to ask the defendant again if he was Thomas Silman.
Alexandria Police Captain Edward L. Christie, who conducted a gunshot residue test on Silman later that afternoon, testified that although the defendant had abrasions on his wrist indicating that the handcuffs were too tight, his demeanor showed no signs of discomfort. Captain Christie further testified that the defendant exhibited no interest in anything that was happening around him, nor did he communicate in any way. Captain Christie stated that Silman seemed so detached under the circumstances, he appeared almost catatonic.
The trial court appointed a three member sanity commission consisting of Dr. Paul Ware, Dr. Joe B. Hayes, and Dr. James D. Calvert. While each member of the sanity commission examined the defendant within 90 days of the shootings, they diagnosed the defendant as having three different illnesses. Dr. Ware initially diagnosed the defendant's mental illness as schizoid personality disorder and possible dissociative disorder. After interviewing defendant's mother and obtaining information regarding defendant's psychological history and other data, Dr. Ware, in his final opinion, diagnosed defendant with reactive psychosis, a form of serious mental illness. At trial, however, Dr. Ware ultimately concluded that defendant suffered from schizotypal personality disorder, the most serious of the personality disorders. Dr. Hayes failed to specify any particular disorder, but he suggested that defendant was psychotic during the time of the shootings. Dr. Calvert's initial diagnosis indicated defendant suffered from borderline personality disorder. Dr. Calvert testified that because people with borderline personality disorder meet the criteria of people with schizotypal personality disorder it is difficult to distinguish between the two. Dr. Calvert testified that his final diagnosis of defendant's mental illness was both borderline personality disorder and schizotypal personality disorder. All doctors concluded that defendant was insane at the time of the offense, but was competent at the time of examination to proceed to trial and assist counsel in his defense.
The defense offered this evidence along with the expert testimony of Dr. Louis Canac and Dr. Stuart Kutz. All of the defense expert witnesses agreed that defendant suffered from schizotypal personality disorder which predisposed him to become psychotic under unusual stress. The defense argued that upon Carolyn and Danny Lewis' arrival at the Silman family home, the defendant's psychosis was triggered causing his inability to distinguish right from wrong. The doctors also agreed that defendant, while experiencing the psychotic break which rendered him incapable of distinguishing right from wrong, killed his family members, rendering him legally insane at the time of the crimes.
The state's position was that the defendant was sane at the time of the crimes, and his homicidal rage was attributed to his fixation with his sister and his disapproval of her marriage to Danny Lewis, who he believed to be African American. The state offered the testimony of expert witnesses Dr. Kenneth Ritter and Dr. Fred Davis. Dr. Ritter, a forensic psychiatrist, rejected the schizotypal personality disorder diagnosis and the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorder (DSM) as an invalid diagnosis and diagnostic tool, respectively. He suggested that defendant suffered from schizoid personality disorder, a form of the personality disorder which does not incite psychotic episodes. Dr. Ritter based his diagnosis on the defendant's *31 lack of prior psychiatric problems; he was employed by the same employer for 15 years without incident; he had ample opportunity, but decided not to kill his mother during his violent outburst; he surrendered without a weapon; and he requested an attorney when he surrendered. Dr. Ritter concluded that the defendant's homicidal rage resulted from jealousy, not a psychotic episode. Dr. Davis, a psychologist, conceded that defendant suffered from a personality disorder, however, he concluded that the defendant's personality disorder exacerbated into a more serious form during his incarceration after the arrest. Both Dr. Ritter and Dr. Davis disagreed with the defense experts and found that defendant could in fact distinguish right from wrong at the time of the crimes.
The trial court concluded that the shooting death of defendant's father, Thomas H. "Buck" Silman, was an accident and found defendant not guilty as charged. With regard to the other first degree murder charges, the trial court found Silman guilty in the shooting deaths of his sister, Carolyn Silman Lewis, his brother-in-law, Danny Lewis, and his uncle, Kermit Allen. The trial court issued the following reasons for verdict:
In reviewing the evidence the Court notes the contradictory nature of the expert expert [sic] testimony. It is extremely difficult (if not impossible) to reach a conclusion based solely on this evidence...
From a realistic point of view, there is no way of knowing or determining what the defendant's state of mind really was at the time of the shootings, and as indicated in the testimony of some the experts in this case, experts can no better determine this than an ordinary person.
Without attempting to recite all of the evidence adduced at the trial, but after having carefully reviewed all of the facts and circumstances of the case, including the video tape of the gunshot residue testing, conduct and attitude of the defendant before, during, and after the shootings, the Court is led to the abiding conclusion beyond any reasonable doubt that at the time of the commission of the alleged offenses, the defendant, Thomas W. Silman, was not suffering from mental disease or mental defect which rendered him incapable of distinguishing between right and wrong with respect to his conduct in shooting and killing the victims in this case.
The trial judge further explained in his reasons for judgment that
The observations of the experts were not only conflicting, but often diametrically opposed to one another. Much of their speculations were based upon subjective information furnished by the defendant and his mother after the crimes had been committed.
Much was made by some experts of the defendant's alleged post-mortum [sic] request that his dead father eat lunch with him. If, in deed, the defendant did do this, it was probably an expression of denial. After all, he did not actively desire his father to be actually dead, whereas, he desired his other homicide victims to be dead, dead, dead.
The court of appeal reversed the trial court's judgment, finding that the testimony of the state's experts, Dr. Ritter and Dr. Davis, was highly questionable and the district court's reliance on that testimony was erroneous. The court of appeal opined:
The state experts, Dr. Ritter and Dr. Davis, found the defendant was sane at the time of the offenses. However, Dr. Ritter testified he did not believe in the existence of defendant's mental illness which was diagnosed by six other mental health experts. Dr. Davis applied a stringent ninety percent certainty rule to a test for sanity which contains more elements than specified in the [Louisiana state] statute. An expert's opinion has no value if the premises on which he bases his conclusions are flawed.
We hasten to emphasize that we are not merely counting up experts to reach a conclusion ... While the state in this case presented the testimony of a psychiatrist and a psychologist, the value of their conclusions is highly questionable.... If these opinions are rejected as valueless, as we think they must, then what remains to be scrutinized is the testimony of the defendant's *32 expert and the lay testimony, both of which support a finding of insanity.
After determining that the opinions of the state's experts were flawed, the court of appeal concluded "beyond a reasonable doubt that defendant [had] proven, by a preponderance of the evidence, his insanity at the time of the offense."

LAW AND DISCUSSION
In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La.R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La.R.S. 14:14; State v. Williams, 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. State v. Bibb, 626 So.2d 913 (La.App. 5th Cir.1993), writ denied, 93-3127 (La. 9/16/94); 642 So.2d 188; State v. Claibon, 395 So.2d 770 (La.1981). Lay testimony pertaining to defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. State v. Peters, supra; State v. Claibon, supra.
In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Peters, 94-0283 (La. 10/17/94); 643 So.2d 1222; State v. Nealy, 450 So.2d 634 (La. 1984); State v. Price, 403 So.2d 660 (La. 1981); State v. Claibon, supra; State v. Roy, 395 So.2d 664 (La.1981).
In the instant case, the state established by the uncontroverted testimony of lay witnesses Claudia Mae Silman, Mrs. Kermit Allen and Sandra Sue Allen that defendant harbored ill feelings toward his sister because of her marriage to Danny Lewis and had on separate occasions made prior threats against their lives. The state also offered the expert testimony of Dr. Ritter and Dr. Davis to rebut the defense's claims that defendant was insane at the time of the crimes. However, the court of appeal unequivocally rejected the opinions of the state's experts. The appellate court relied on State v. Peters, 94-0283 (La. 10/17/94); 643 So.2d 1222, for the proposition that because the state failed to produce (credible) expert witnesses to rebut the defendant's expert testimony establishing that the accused was legally insane at the time of the crimes, the judgment of the trial court finding defendant legally sane at the time of the offenses must be reversed.
The state's key expert, Dr. Ritter, described defendant as having a schizoid personality. He explained that the term "schizoid personality" only describes what the defendant is and the term is symbolic in describing persons who are loners, introverts and who do not interact with very many people. He explained that persons who exhibit a schizoid personality are not necessarily suffering from mental disorders or mental illness, and persons who exhibit a schizoid personality are capable of distinguishing right from wrong. Dr. Ritter testified that the fact that a person is withdrawn is not evidence of psychosis.
Defense expert, Dr. Calvert, testified that there were a number of factors considered during his evaluation of Silman which were attributed to his diagnostic conclusion that on the day of the shooting Silman experienced a psychotic episode. Among the factors reported *33 were the defendant's sketchy memory of the events; the confusion exhibited by the defendant, such as the statements made by the defendant as he exited the house; defendant's assertion to Drs. Calvert and Ware that he attempted to get his father up to eat dinner with him; and the rage and depression the defendant demonstrated. The defense's other expert, Dr. Ware, also agreed that Silman underwent a psychotic break at the time of the shootings. He testified that defendant suffered from delusional thinking as evidenced by the fact that he thought his brother-in-law, Danny Lewis, was African American. He also diagnosed defendant with reactive psychosis. He concluded that the unusual stress defendant experienced when Carolyn and Danny Lewis arrived at the family home triggered defendant's reactive psychosis.
When asked to formulate an opinion in regard to Drs. Calvert and Ware's conclusion that Silman suffered a brief psychotic episode, Dr. Ritter testified that defendant's memory loss may be psychological or it may be malingering considering that defendant remembers everything prior to and after the time of the incident, but experiences amnesia with regard to the crimes themselves. He also explained that true memory impairment or amnesia is one that is not recoverable because of brain damage. Dr. Ritter further testified that defendant's statements, "[w]hat's going on" and "[w]hat are all of you damn heroes doing out here," followed by his request for a lawyer were not signs of confusion, but instead it indicated that defendant knew exactly what was happening around him. In regard to defendant's allegation that he attempted to wake his father for dinner, Dr. Ritter stated that if in fact this event did occur, from a psychiatric standpoint, defendant was in denial of his father's death. Dr. Ritter stated that in his opinion it was not a desire for Silman to kill his father and his father's shooting death was an accident. Dr. Ritter went on to explain that Dr. Calvert's diagnosis that the defendant exhibited rage and depression was inconceivable. According to Dr. Ritter, "depression is anger turned upon the self." He stated that it is impossible for people who are in a rage to feel depressed and vise versa. Moreover, Dr. Ritter opined that when Silman reported to him that "they needed killing" he was justifying the killings, not necessarily the killing of his father and uncle, but definitely the killing of his sister and her husband. Finally, Dr. Ritter explained, "when you refer to psychosis you're talking about major mental illness, a major mental disorder ... that doesn't ordinarily occur in brief periods."
Dr. Ritter testified that defendant displayed no signs of schizophrenia, major psychosis, manic depressive psychosis or organic mental disorder. He stated that rage in itself, anger in itself or a jealous rage in itself are not psychosis. According to Dr. Ritter, at the time of the shootings Silman displayed a jealous rage. He described defendant as becoming "incensed, irate, angry, and racial" over his sister's relationship with her husband, and having a seething caldron of rage that was simmering constantly and would boil over at times, then simmer down. Dr. Ritter testified that Silman had told him that he slapped his sister during a confrontation he had with her while visiting her. He explained that this incident caused the caldron to boil over, then simmer down. He further testified that other psychological factors such as defendant losing his hair, his teeth deteriorating and, most important, feeling betrayed by his sister contributed to the caldron boiling. Finally, Dr. Ritter recounted that when Carolyn and Danny Lewis arrived at the Silman family home, "the caldron boiled over again and, that was it." Dr. Ritter further opined that Silman's reference to his brother-in-law as "nigger" was not delusional, but in fact a disparagement and a debasement.
In reaching his conclusion that defendant did not suffer a psychotic break and that he was able to distinguish right from wrong at the time of the offenses, Dr. Ritter emphasized, among other things, that defendant missed less than ten days while employed with the same company for 15 years; prior to the shootings, defendant expressed the idea of killing his sister, then realized if he did, there would be a severe penalty involved; defendant chose not to kill his mother; defendant had no prior psychological problems; defendant surrendered without a weapon, indicating *34 that he knew if he walked outside with the weapon he would have been shot; defendant reported to the police and reported during his evaluation that they needed killing, expressing justification for the killing of his sister and brother-in-law; defendant resisted arrest and stated that he was firing at the officers so they would not arrest him; and defendant, while laying on the ground being apprehended, asked to see his lawyer which indicates he knew what was happening around him.
The court of appeal rejected Dr. Ritter's testimony because he failed to acknowledge the existence of schizotypal personality disorder and he did not recognize the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM) as a valid diagnostic tool or learned treatise, stating that his opinion was "highly questionable" and "flawed." We disagree.
The court expressly noted in its opinion that "[t]he DSM-III-R is a diagnostic manual of mental disorders used by nearly all mental health professionals. The book is recognized as authoritative for diagnostic purposes. The DSM is continually revised and updated as the mental health field changes and grows. The manual promotes uniformity by establishing various diagnostic criteria for enumerated illnesses, resulting in more accurate and more conservative diagnoses." During the pendency of these proceedings in the lower courts, only DSM-III-R and its predecessors, DSM, DSM-II and DSM-III were offered as diagnostic tools in the field of psychiatry. Since the rendition of the appellate court's opinion, its successor, DSM-IV, was published. While this court declines to speculate whether the DSM is a reliable psychiatric diagnostic tool, we note that the recent addition of the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, xxiii (4th ed. 1994) warns against the dangers of DSM-IV criteria being utilized in a forensic setting. According to the APA,
When the DSM-IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," or "mental defect." In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is usually required beyond that contained in the DSM-IV diagnosis. This might include information about the individual's functional impairments and how these impairments affect the particular abilities in question. It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.
Nonclinical decision makers should also be cautioned that a diagnosis does not carry any necessary implications regarding the causes of the individual's mental disorder or its associated impairments. Inclusion of a disorder in the Classification (as in medicine generally) does not require that there be knowledge about its etiology. Moreover, the fact that an individual's presentation meets the criteria for a DSM-IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time.
(emphasis added).
Thus, by the APA's own principles, a person clinically diagnosed with a particular mental disorder does not in itself determine that the person was legally insane at the time the crimes were committed. Although the DSM-III and IV signify that illnesses such as schizophrenia and other psychotic disorders *35 usually manifest themselves during adolescence or early adulthood, the issue before this court is not whether defendant suffered from a particular psychiatric personality disorder, but rather whether the defendant was able to distinguish right from wrong at the time of the offenses.
The defense also offered the expert testimony of Dr. Davis, a psychologist, who corroborated Dr. Ritter's findings that defendant was not legally insane at the time of the crimes. Dr. Davis testified that the data obtained in his forensic evaluation of defendant was not sufficient to support the defendant's claim of psychosis on the day of the killings. He explained that unlike a psychiatric evaluation, a forensic evaluation requires a standard of proof with ninety percent certainty to establish legal insanity. Dr. Davis testified that although he found some evidence which suggested defendant was psychotic on the day of the shootings, he found no evidence that defendant could not distinguish between right and wrong at the time of the killings. When asked to formulate an opinion in regard to Silman's mental capacity immediately after the killings, Dr. Davis stated, "[h]e was under attack by the police and felt like that [sic] they were going to uh, uh, come and get him and harm him. Uh, I have the feeling that behavior might be an indication that Thomas was aware that what he had done was wrong and that people would react to it in a negative way." Dr. Davis did agree that Silman suffered from a personality disorder, but concluded that the disorder deteriorated as a result of his incarceration. Dr. Davis echoed Dr. Ritter's conclusions that defendant was able to distinguish right from wrong at the time of the killings. He based his opinion on the fact that: 1) Silman stated that he would kill his sister if he did not have to spend time in the penitentiary; 2) Silman had approximately a two hour standoff and shootout with the police after the killings; and 3) Silman chose not to kill his mother during his alleged psychotic episode. Dr. Davis found that these factors were a clear indication that Silman was sane at the time of the crimes.
The court of appeal also discounted the testimony of Dr. Davis as "questionable" and "flawed" on the basis that Dr. Davis "evaluated the defendant using a standard which allowed a finding of legal insanity only if he could conclude with ninety percent certainty that clear and unmistakable data supported his conclusion." The court determined that because the insanity test employed by Dr. Davis required more elements than required under Louisiana law, his finding should and must be excluded as evidence in determining the defendant's mental condition at the time of the offenses.
As this court has previously stated, a determination of the weight of evidence is a question of fact which rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. See State v. Bibb, supra; State v. Claibon, supra; State v. Nolan, 503 So.2d 1186 (La.App. 3d Cir.), writ denied, 507 So.2d 226 (La.1987). If rational tiers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. Thus, irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. State v. Mussall, 523 So.2d 1305 (La.1988); Jackson v. Virginia, supra.
It is well settled that sanity is presumed and the defendant has the burden of proving by a preponderance of the evidence that he was legally insane at the time of the commission of the offenses. In the trial court's reasons for judgment, the trial judge expressed his difficulty in reaching a conclusion based solely on the contradictory expert testimony. He was required by the laws of this state to weigh all the evidence presented before him and to make a rational decision regarding the defendant's claim of insanity and he did. Assuming arguendo that Dr. Davis' testimony should be excluded from the evidence, the testimony of lay witnesses and the state's other expert, Dr. Ritter, was sufficient to allow the trier of fact to rationally conclude that defendant was able to distinguish right from wrong at the time of the homicides.
*36 Furthermore, we find that the appellate court erred when it disregarded the testimony of Dr. Ritter, a well respected forensic psychiatrist, and reversed the trial court's judgment on that basis. Dr. Ritter has practiced forensic psychiatry in the New Orleans area since 1981 and is recognized in the state of Louisiana and neighboring states as an accomplished expert in this field. In fact, in State v. Peters, supra, the very case upon which the court of appeal relies in reaching it decision, Dr. Ritter was one of the key expert witnesses for the defense who testified that Peters was insane at the time of the offense. To find that the testimony of other expert witnesses was more credible is one thing, but to reject Dr. Ritter's testimony as "questionable" or "flawed" was error.
In the case before us, Dr. Ritter stressed, among other things, that defendant's prior threats, the fact that he did not kill his mother, coupled with defendant being coherent enough to ask for an attorney when he was apprehended is significant evidence to prove that he was able to distinguish right from wrong at the time of the crimes. Moreover, the lay testimony and the expert testimony of Dr. Ritter and Dr. Davis clearly provided a rational basis for the trial judge to reject defendant's insanity defense. Accordingly, we find that the evidence was sufficient to establish that defendant failed to prove insanity by a preponderance of the evidence.
For these reasons, we reverse the decision of the court of appeal and reinstate the trial court's judgment.
REVERSED.
VICTORY, J., concurs in result.
NOTES
[1] Calogero, C.J., not on panel. Rule IV, § 3. Judge Ned E. Doucet, Jr., Court of Appeal, Third Circuit, sitting by assignment in place of Justice James L. Dennis.