NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-1163

STATE OF LOUISIANA

VERSUS

D'ANDRE JAMAL SENEGAL

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 56338-L
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

**********

DAVID KENT SAVOIE
JUDGE

**********

Court composed of Marc T. Amy, John E. Conery, and David Kent Savoie, Judges.

AFFIRMED.

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**P. O. Box 2806**
**Monroe, LA 71207-2806**
**(318) 855-6038**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **D'Andre Jamal Senegal**

**Roger P. Hamilton, Jr.**
**Assistant District Attorney**
**P. O. Box 2206**
**Lafayette, LA 70511**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**D'Andre Jamal Senegal**
**Louisiana State Penitentiary**
**Angola, LA 70712-9999**
**DEFENDANT/APPELLANT**

**SAVOIE, Judge.**

The Defendant, D'Andre Senegal, was charged by grand jury indictment with two counts of first degree murder, violations of La.R.S. 14:30(A)(3), one count of second degree kidnapping, a violation of La.R.S. 14:44.1, and two counts of obstruction of justice, violations of La.R.S. 14:130.1(A)(1) and 14:130.1(A)(2). After a trial by jury, he was convicted as charged and subsequently sentenced to life imprisonment on each of the first degree murder charges. For second degree kidnapping, the Defendant was sentenced to ten years at hard labor with the first two years to be served without benefit of parole, probation, or suspension of sentence. Finally, for the two counts of obstruction of justice, the Defendant was sentenced to twenty-five years at hard labor on each count. The court ordered that all sentences run concurrently. The Defendant is before this court appealing his convictions challenging the sufficiency of the evidence presented for four of the five offenses.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR

The Defendant contends the evidence presented at trial was insufficient to support his convictions. Specifically, the Defendant complains that the testimony of the State's witnesses, uncorroborated by physical evidence, was contradictory and thus insufficient.

Amanda Lebon first met the Defendant, known to her as "Dumway," in 2011 or 2012. In February 2013, she and the Defendant lived together and she was

pregnant with his child. Also living in the home were Amanda's five year old little boy, DeMarion, whose father is Dustin Williams, and her one year old little girl, Mya, who is the Defendant's child. On February 12, 2013, at about 6:40 a.m., the Defendant woke Amanda and asked her to take him to Dustin's house so he could talk to Dustin about who had slashed his tires. She complied with the Defendant's request, and they left the house before 7:00 a.m. with the children. Amanda drove her black Chevrolet Impala. According to Amanda, the Defendant's demeanor was calm.

Amanda dropped the Defendant off in front of Constance Vallien's (Dustin Williams' mother's) home. (Vallien's testimony confirmed that the Defendant visited her home that morning about 7:00 or 7:30 a.m. seeking to ask her son Dustin if he knew who had slashed the tires on the Defendant's car. Dustin did not want to get out of bed, so the Defendant left.) Upon receiving a phone call from the Defendant some five or six minutes later, Amanda returned to the front of the home and picked him up. He then asked Amanda to bring him to see Gary (at Kim Hanks' house) so he could talk to him about who might have slashed his tires. According to Amanda, the Defendant was calm when he made this request. They proceeded to Hanks' home where Amanda dropped the Defendant off. According to Amanda, the Defendant knocked on the door and it was opened by Kim Hanks. Amanda waited in the car with her children. She said that when the Defendant opened the door to leave, he appeared to be arguing with someone and he had a black medium-size gun in his hand. Amanda testified he fired the gun twice and he ran off the porch. She let off her brakes like she was going to pull off, and the Defendant "kind of picked up the gun a little bit," and she did not know if he was going to shoot, so she stayed there and let him get in the car. The Defendant told

2

Amanda he would kill her and DeMarion if she did not take him where he wanted to go. Threatened and scared, Amanda drove the Defendant to Gross Isle Road which goes into a cane field. It was muddy out there at the time. The Defendant got out of the car and ran around a hill and into the woods. Amanda sat in the car trying to think of how she could get away without her or her children getting hurt. She said a thousand things ran through her mind and she thought about calling her grandmother or the cops. She said she thought about backing all the way down the road, but it was about a mile long and she thought she "probably would have hit the ditch just because of [her] being scared." While she was sitting in the car thinking about what to do, the Defendant returned to the car without the gun. He told Amanda to drive him toward Lafayette, but she told him she did not have any gas. He responded that he would give her $10.00.

When they left Grosse Isle Road, Amanda asked the Defendant about Gary and the Defendant told her the last time he saw him, he was just "laying there." When Amanda started to cry, the Defendant "slapped [her] or whatever," giving her a black eye.[1] Amanda proceeded the "back way" toward Lafayette, stopping at a Chevron station to put gas in her car, something the Defendant told her to do. Amanda paid for the gas inside the store. She testified that she was too scared to say anything and "was just thinking [she] need[ed] to find a way to get away from him" and if she took too long in the store he would come. She testified that she felt she had to do what he said because she was threatened by him. They were at the Chevron station for about ten minutes. From there, the Defendant told her to take him to Lady of Lourdes so he could clean the mud off his shoes. Amanda testified

---

[1] Lieutenant David Hardy of the Abbeville Police Department interviewed Amanda on the 12th and again on the 14th. He said he first noticed her black eye when he interviewed her on the 14th.

that she knew that was her chance to get away from the Defendant. When the Defendant went into the hospital, Amanda drove off. She then called the Defendant's mother and told her that she did not know whether the Defendant killed anyone, but he fired a gun, and she was going to call the police.[2] Amanda then called her grandmother and drove to her house. When Amanda arrived at her grandmother's house, her father and the police were there. Amanda testified that by the time she got to her grandmother's house, the Defendant was already calling her phone asking why all the cops were at her grandmother's house. Amanda testified that the Defendant had called a couple of other times and, when she did not answer, he left messages saying he was going to kill her. The conversations Amanda did have with the Defendant were over the speakerphone. When asked if any of the conversations caused her concern, Amanda testified that she was concerned because the Defendant was in the area she was in. When asked if he threatened her, Amanda replied, "[h]e just kept saying, I thought you loved me. Why would you do this? Why would you call the cops on me?" When asked what it was she found threatening, Amanda replied, "[t]hat he said he was going to kill me."

Amanda was escorted from her grandmother's house to the Abbeville Police Department. From there, she took law enforcement to the place she had previously taken the Defendant to hide the gun. Amanda identified the Defendant in a lineup and later in court.

On cross-examination, Amanda testified she became involved in a sexual relationship with the Defendant when he was sixteen and she was twenty-four. Prior to her relationship with the Defendant, Amanda hung out with Gary and his

---

[2]On cross-examination, Amanda testified she asked her grandmother to call the police.

4

friends and that is how she met the Defendant. Amanda testified she and Gary were good friends. However, Amanda testified in July of 2012, she wrote the Defendant a letter in which she expressed anger with Gary because he had allegedly said some bad things about her. In the letter, Amanda told the Defendant that he did not need to be friends with "these people" anymore and that they were a bad influence on him. Amanda said she wanted to distance both herself and the Defendant from these people "to better both of our lives." However, she insisted she would never do anything to hurt them. The Defendant did not want to stop hanging out with "them" so he and Amanda continued to hang out with them, and Amanda continued her relationship with the Defendant.

Amanda testified that prior to the day in question, she and the Defendant had discussed who they thought slashed the Defendant's tires. Amanda mentioned it could be Dustin, the father of one of her children. She also suggested it could be Gary. According to Amanda, she and the Defendant were not on good terms around the time of the incident. The night before the incident was one of the first nights the Defendant had stayed at Amanda's house because they had been "off and on." According to Amanda, the two had a disagreement about what happened when they were not together and he beat her up "all in [her] ribs and [her] chest." When asked why she allowed the Defendant to stay after beating her up, Amanda replied that she had no control over him and if she called the police something worse would have happened. The next morning he woke her up and according to Amanda, "[she was] already terrified." Amanda also testified on cross examination that she could have left the Defendant at Gary's, but she chose not to leave. She also explained that one of the reasons she did not want to leave when the Defendant went to hide the gun was that she was worried she would go in the

ditch. She also said he could have heard her if she backed up and he still had the gun. According to Amanda, she was too scared to move and get shot at. She also had a cell phone but did not call anyone during the seven minutes he was gone from the car. When asked why she did not call 911, she explained that they could have called her cell phone back by the time he got in the car and because of her history of domestic abuse with the Defendant, she was scared. Amanda also confirmed she did not ask for help when she went inside the gas station to pay for the gas. She explained that she thought about saying something to the cashier, but she was worried if she took too long, the Defendant might "think something." She also said she was worried about the safety of her children since they were in the car with the Defendant.

Hahn Hanks testified that on February 12, 2013, she had been dating Michael Guidry, the father of her child, for six months. Her sister Kim dated Michael's brother, Gary Guidry, Jr., and it was his birthday. Hahn testified she was awakened around 7:30 a.m. by banging on Kim's bedroom door. Hahn and Michael were on Hahn's bed in the living room. Hahn heard Gary say, "who is it?" and she heard "him" say it was Dumway. She heard the door drag on the floor, heard arguing, and then heard Gary say, "I'm not scared." She then heard two gunshots. She got up and heard shouting. Michael was getting up pulling up his pants, and Dumway was walking out of the room. When Dumway saw Michael (T-Mike), he "grabbed [the gun] out" and T-Mike said "why did you do that? I'm going to get you." When T-Mike said this, he was sitting on the bed. Dumway aimed the gun at him, and Hahn ran into the other room to meet her nephew, Jaylen. T-Mike told the Defendant, "don't do it, Dumway, don't do it," and Hahn heard two shots fired. When Hahn heard the door shut, she called 911.

She then looked out the bedroom window and saw Amanda's black car and saw the driver door open and close. Like Amanda, Hahn identified the Defendant in a photo lineup at the police station as well as in the courtroom.

Hahn's sister Kim testified that, at the time of the incident, she was engaged to Gary, and they had a two month old baby, Josiah. On the morning of the murders, Kim awoke at 6:30 a.m. and fed the baby a bottle. About thirty minutes to an hour later, she put Josiah in his bassinet which was on her side of the bed. Kim then tried to go back to sleep but did not succeed because the door of the room was pushed open by the Defendant. He said Gary had flattened his tires, and he knew it because the neighbors and Amanda had told him it was Gary. During the conversation, the Defendant was standing at the foot of their bed swaying from side to side and his attention was on Gary. According to Kim, the Defendant did not pay attention to her when she tried to reason with him. Gary sat up in bed when he talked to the Defendant but did not get out of the bed and did not have a weapon nearby. Kim testified that Gary asked the Defendant why he threatened him instead of questioning him about the tires. The Defendant replied, "I know it was you," and he pulled a black handgun out of his pants. Gary said, "I'm not afraid of the," but before he could say "gun," the Defendant shot him twice. The Defendant left the room, and Kim then heard Michael saying "don't do it," and the Defendant said, "bitch, I'll kill you and your son." He then shot Michael twice. Kim testified she saw the Defendant driving the car away from the scene. According to Kim, she did not see nor hear anyone else with the Defendant in the house. Like Amanda and Hahn, Kim identified the Defendant both in a photographic lineup and in the courtroom. On cross-examination, both Kim and Hahn denied answering the door and letting the Defendant in the house.

The Defendant was apprehended by authorities a short time after he ran out from underneath his grandfather's house where he had been hiding, and the gun was recovered at the location shown to them by Amanda. Several law enforcement officers testified at trial, but none of them testified that they listened to Amanda's voicemail messages in which she claimed the Defendant threatened to kill her. Lieutenant Hardy of the Abbeville Police Department testified he took Amanda's black Impala from her on the 14th [February, 2013] and inspected it. The only thing he observed that may have pertained to the investigation was mud on the passenger-side floorboard. Dr. Christopher Tape of the Louisiana Forensic Center determined the cause of death of both victims to be a gunshot wound to the head.

*First Degree Murder*

In his argument regarding the insufficiency of the evidence to prove the murders, the Defendant points to internal inconsistencies in Amanda Lebon's testimony as well as inconsistencies between her testimony and the testimony of the Hanks sisters. Specifically, he notes that Amanda testified she was good friends with Gary, but then testified that she tried to persuade the Defendant to stay away from Gary and his friends. He then focuses on Amanda's testimony that the Defendant exited and re-entered the passenger door of the car at the Hanks' house whereas Hahn Hanks testified when she looked out she saw the driver door shutting and Kim Hanks testified she did not see anyone get back into the car and she could not see anyone else in the car. Finally, the Defendant notes the differing testimony as to whether Kim Hanks answered the door when the Defendant arrived at the Hanks' residence.

The supreme court has discussed the standard for reviewing sufficiency of the evidence claims:

8

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall,* 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman,* 95-0154 (La. 11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave,* 95-2328 (La. 4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*

*State v. Macon,* 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

Louisiana courts have previously discussed the extent to which a reviewing court may question credibility determinations made by the fact finder. "It is not the function of an appellate court to assess credibility. . . ." *Id.* at 1286. "The actual trier of fact's *rational* credibility calls . . . are preserved through the requirement that upon judicial review all of the evidence is to be considered as if by a rational fact finder in the light most favorable to the prosecution. . . ." *Mussall,* 523 So.2d at 1311 (citing *Jackson,* 443 U.S. 307, 99 S.Ct. 2781). "[T]he actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *Id.* at 1310 (citing *Jackson*, 443 U.S. 307, 99 S.Ct. 2781). "In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction or convictions." *State v. Stec,* 99-633, pp. 4-5 (La. App. 5 Cir. 11/30/99), 749 So.2d 784, 787.

*State v. H.L.J.,* 08-1070, p. 16 (La.App. 3 Cir. 4/1/09), 6 So.3d 997, 1006-07.

The inconsistencies in testimony pointed out by the Defense in this assignment of error are a matter of credibility, which is in the purview of the fact finder. The jury's verdict indicates it viewed any inconsistency in the witnesses'

testimonies as insignificant to their overall credibility. We will not disturb the credibility determination made by the jury. The Defendant's claim has no merit.

*Second Degree Kidnapping*

The Defendant focuses on the facts that indicate that Amanda, who was driving the car, did not do anything to try to get away from the Defendant at Grosse Isle Road or at the gas station despite the fact she had the opportunity. According to the Defendant, Amanda was trying to "extricate herself from her own culpability."

Louisiana Revised Statutes 14:44.1 provides in pertinent part:

> A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
>
> (1) Used as a shield or hostage;
>
> (2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
>
> (3) Physically injured or sexually abused;
>
> (4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
>
> (5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
>
> B. For purposes of this Section, kidnapping is:
>
> (1) The forcible seizing and carrying of any person from one place to another; or
>
> (2) The enticing or persuading of any person to go from one place to another; or
>
> (3) The imprisoning or forcible secreting of any person.

The evidence established that, upon leaving the Hanks' residence after having shot Gary and Michael, the Defendant, who was armed, told Amanda he would kill her and her child DeMarion if she did not take him where he wanted to go. Threatened and scared, Amanda drove the Defendant to Grosse Isle Road. Then, when driving from Grosse Isle Road to Lafayette, although no longer armed, the Defendant slapped Amanda in the face, giving her a black eye. The jury clearly found Amanda's testimony to be credible regarding the kidnapping and her testimony established the elements of second degree kidnapping beyond a reasonable doubt. Therefore, this claim is without merit.

*Obstruction of Justice*

The Defendant challenges only Count 5 of obstruction of justice concerning the threats made by the Defendant to Amanda Lebon. Although Amanda testified that the Defendant left messages in which he threatened to kill her, his contention on appeal is that no one else heard these messages and further, that it was not proven that these messages were made with the "intent to influence her in providing testimony or evidence." In other words, there was no "or else" component to the threats, meaning the evidence presented to prove the offense of obstruction of justice was lacking. This claim has no merit.

Louisiana Revised Statutes 14:130.1(A)(2) provides:

> A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
>
> (2) Using or threatening force toward the person or property of another with the specific intent to:
>
> > (a) Influence the testimony of any person in any criminal proceeding;

11

(b) Cause or induce the withholding of testimony or withholding of records, documents, or other objects from any criminal proceeding;

(c) Cause or induce the alteration, destruction, mutilation, or concealment of any object with the specific intent to impair the object's integrity or availability for use in any criminal proceeding;

(d) Evade legal process or the summoning of a person to appear as a witness or to produce a record, document, or other object in any criminal proceeding;

(e) Cause the hindrance, delay, or prevention of the communication to a peace officer, as defined in R.S. 14:30, of information relating to an arrest or potential arrest or relating to the commission or possible commission of a crime or parole or probation violation.

Count 5 of the indictment charged the Defendant in pertinent part as follows:

[The Defendant] did intentionally use or threaten force toward the person or property of another with the specific intent to influence the testimony of any person in any criminal proceeding and cause or induce the alteration, destruction, mutilation, or concealment of any object with the specific intent to impair the object's integrity or availability for use in any criminal proceeding; in violation of the provisions of LSA-R.S. 14:130.1(A)(2).

The State argues on appeal that the Defendant's threat to kill Amanda if she did not take him where he wanted to go (which was a place to hide the gun he had used in the murders) was sufficient to prove the obstruction of justice charge. Additionally, the State points out that the messages the Defendant left (wherein he tells Amanda he was going to kill her and asks why she called the cops on him) was sufficient to sustain this conviction.

Notwithstanding the argument that the evidence was not sufficient to prove that the Defendant's threats were made with the specific intent to influence her testimony under La.R.S. 14:130.1(A)(2), it was sufficient to show that they were made with the specific intent to cause or induce the concealment of the gun with

the specific intent to impair its availability for use in the criminal proceeding in accordance with La.R.S. 14:130.1(A)(2)(c).  As such, this claim has no merit.

## DECREE

For the foregoing reasons, the Defendant's convictions and sentences are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.  Uniform Rules—Courts of Appeal.  Rule 2–16.3.