972 So.2d 1240 (2007)
STATE of Louisiana
v.
Brian K. BOYD.
No. 2007-KA-0534.
Court of Appeal of Louisiana, Fourth Circuit.
December 5, 2007.
Eddie J. Jordan, Jr., District Attorney, Alyson Graugnard, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Mary. Constance Hanes, Louisiana Appellate Project New Orleans, LA, for Defendant/Appellant.
*1241 (Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge CHARLES R. JONES, Judge EDWIN A. LOMBARD).
EDWIN A. LOMBARD, Judge.
The defendant/appellant, Brian K. Boyd, challenges his conviction for armed robbery. After review of the record in light of the applicable law and arguments of the parties, the defendant's conviction is affirmed.
Procedural History
In December 2005, the defendant was charged by bill of information with armed robbery, a violation of La.Rev.Stat. 14:64. On January 18, 2006, he pleaded not guilty. The trial court found probable cause to support the charge after a preliminary hearing on February 3, 2006, and, after a subsequent hearing on October 16, 2006, the trial court denied the defendant's motion to suppress the identification as to both victims.
The defendant's first trial ended with a hung jury on October 18, 2006. On November 30, 2006, at the end of the defendant's second trial, the jury found the defendant guilty as charged. A multiple bill hearing was set for January 5, 2007, but was continued on the State's motion. On January 26, 2007 the State failed to produce the evidence necessary to go forward with the multiple bill hearing and the trial court sentenced the defendant to thirty years at hard labor without benefit of probation, parole, or suspension of sentence.
The defendant filed a timely appeal, challenging the sufficiency of the evidence underlying his conviction for armed robbery.
Law and Discussion
In his sole assignment of error, the defendant contends that the evidence is insufficient to support his conviction for armed robbery because the State failed to negate any reasonable probability of misidentification. The defendant asserts that the identification was unreliable because (1) there is no physical evidence linking him to the crime; (2) the victims and witness were told by police officers that he had been arrested for the crime before having them identify him sitting in the back seat of a police vehicle; and (3) one of the witnesses (Mr. Campagna) identified him at the second trial after failing to identify him at his first trial.
To convict a defendant of armed robbery, the State must prove beyond a reasonable doubt that defendant took something of value belonging to another from the person of another or that was in the immediate control of another, by the use of force or intimidation, while armed with a dangerous weapon. La.Rev.Stat. 14:64
We review the sufficiency of the evidence to support a conviction under the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560(1979). Accordingly, the court must determine whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all the elements of the crime had been proved beyond a reasonable doubt. State v. Captville, 448 So.2d 676, 678 (La.1984). The determination of the weight of evidence is a question of fact which rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, 35. Thus, it is not the function of an appellate court to assess credibility or re-weigh the evidence and we may only impinge on the factfinding function of the *1242 jury to the extent necessary under Jackson. State v. Bordenave, 95-2328 (La.4/26/96), 678 So.2d 19, 20. Finally, we review the reliability of an identification in accordance with the factors set out Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977):(1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. State v. Stewart, 2004-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639.
The following evidence was adduced at trial. In the early morning hours of August, 6, 2005, three police officers (Officers David Gaines, Patrick Schneider and Dwayne Breaux) were patrolling Governor Nicholls Street on horseback when, as they neared the Bourbon Street intersection, they saw a man run past them. Less than 30 seconds later, the three police officers were flagged down by three pedestrians (John Bozant, Ronald Campagna, and Michael Hatchett) who informed them that a robbery had just occurred and that the perpetrator, a white male wearing shorts and a blue shirt, ran down Governor Nicholls Street. Officers Schneider and Breaux immediately turned around in pursuit of the man who had just run past them. Officer Gaines paused briefly to discover if anyone needed medical attention and to call the dispatch office of the New Orleans Police Department (NOPD) of the incident before joining the pursuit. The defendant, now pursued by the officers, ran down Governor Nicholls, turned right on Dauphine for one block, and then turned left onto Barracks Street where the officers subsequently found him hiding underneath a Nissan Xterra in the 900 block of Barracks Street. Because the defendant refused to comply with Officer Schneider's orders to come out from underneath the vehicle, the officers dismounted and physically removed him as he resisted. Nothing about the defendant's appearance or odor indicated that he was intoxicated.
Shortly thereafter, the two robbery victims (Mr. Bozant and Mr. Campagna) and the witness (Mr. Hatchett) to the robbery arrived and positively identified the defendant as the man who had just committed battery and armed robbery. In addition, Officer Schneider found a broken green bottleneck near the front right wheel of the Nissan Xterra, which matched the color and texture of five pieces of broken glass recovered in the 1100 block of Bourbon Street.[1] The wallet seized from the victims, containing approximately $15.00, was not found on the defendant nor recovered in a brief (10 to 15 minute) search of the two and one-half block area between the robbery site and arrest site.
The two victims (Mr. Bozant and Mr. Campagna), the witness (Mr. Hatchett), and two of the police officers (Officers Gaines and Schneider) testified at the trial. Officer Gaines identified the defendant in court, stating that he got a full view of the man running down Governor Nicholls but conceding that, because of parked cars obstructing his view, he did not see the defendant's hands and, therefore, did not see a bottleneck in the defendant's hands or stop him as he ran down the street. He *1243 did not recall seeing any other people were on the street. When questioned whether the defendant could have been asleep under the car when the officers ordered him to come out, Officer Gaines testified that defendant appeared to be awake as he. resisted the officers, who were pulling him out, According to Officer Gaines, the defendant told the officers that he did not know what they were talking about. The officer explained that the defendant's clothing, which normally would have been collected from the sheriff to be put into the property room as evidence in this case, was not immediately collected from the sheriff's office and therefore was lost in the aftermath of Hurricane Katrina which came through New Orleans less than two weeks after the robbery.
Officer Gaines testified that, after the defendant was secured, he headed back to the crime scene and met the victims and witness who were walking toward the arrest location. He told them that there had been an arrest and escorted them to the arrest location. Officer Gaines stated that he took the defendant out of the police car and asked the three men if they recognized the defendant from the incident. In response to defense counsel questioning, Officer Gaines conceded that this information was not in the police report and that he did not "recall everything. I testified to before [but] I recall the incident and I believe I got him out of the car so they could view him for identification." According to Officer Gaines, the two victims and the witness were about twenty feet from the defendant when they made their identifications. When shown the defendant's black and white booking photograph by defense counsel, Officer Gaines conceded that it appeared that there was some white in the blue shirt and that, as indicated by the scabs on the defendant's forehead and cheek,[2] force was used to pull the defendant from underneath the vehicle.
Further, Officer Gaines recalled that Mr. Bozant told him that he fell backward on top of the perpetrator, and both of them fell onto the ground. Although that area was his usual area to patrol, the officer stated that he had never seen anyone sleeping underneath a car and that homeless people sleep on sidewalks, in doorways, and in parks. When asked if the person he saw running was the same person he pulled from under the vehicle, Officer Gaines answered: "Same person, no doubt." On recross-examination, however, the officer admitted that he personally lost sight of the person running on Governor Nicholls Street.
Mr. Bozant, a retired podiatrist, testified that in the early morning hours of August 6, 2005 he and his friend, Mr. Campagna, were walking along Bourbon Street heading east toward the Faubourg Marigny. There were not many people around, but he noticed a couple walking on the other side of the street in the opposite direction. Between Ursuline and Governor Nicholls, Mr. Bozant turned and noticed a man walking behind him. Moments later he was attacked. The man broke something or created some noise behind Mr. Bozant. Then the perpetrator's right arm came over Mr. Bozant's shoulder and grabbed him around his neck. Mr. Bozant said he knew the perpetrator had a weapon in his left hand. The perpetrator then told Mr. Campagna to give him everything or he would kill Mr. Bozant. In order to protect his neck (he had serious spine problems *1244 there), Mr. Bozant tilted backward, and the two men fell backward. Mr. Bozant fell on top of the attacker. During the commotion Mr. Bozant used his right hand to block the weapon at the left side of his neck, and his hand was cut by a broken beer bottle. Meanwhile Mr. Campagna had tried to hand or throw his wallet to the perpetrator who was getting out from under Mr. Bozant. The perpetrator picked up the wallet as Mr. Bozant was getting up, ran across the street diagonally to the intersection and turned left on Governor Nicholls. When asked about the moments before the attack when he saw the attacker, Mr. Bozant said: "At the moment that I looked he was crossing the street and stepping up onto the curb that we had just passed. And there was either a street lamp or a light from a building in a doorway enough to illuminate his face." Mr. Bozant stated that the perpetrator was a white man with a receding hairline and thin combed back black hair and that he was wearing shorts and a button shirt. Mr. Bozant explained that he was in "close intimate contact" with the perpetrator. Mr. Bozant said: "I had a very good view of the profile of his face. It clearly matched the view I had from a distance for moments prior to the attack." He said he then became aware of a witness walking toward him from the opposite direction and a pair of mounted police. He described the attack and the attacker and pointed in the direction the man had run. Mr. Bozant stated that he saw his attacker again when he walked about three blocks to "the dog park" between Governor Nicholls and Barracks where there was police activity. At some point, one of the officers asked Mr. Bozant to survey the scene and see if he could pick out the attacker. Mr. Bozant said that he picked out the defendant, who was seated in the back seat of an unmarked car. Mr. Bozant stated: "And it was very clearly the same man." He "was absolutely certain." Very little time had transpired. The mounted officers were there within minutes of the attack, and he and Mr. Campagna walked only about three blocks before they found the police activity. An officer showed him the weapon, and he knew it was the same weapon. He identified the broken neck of a green beer bottle, and he identified the defendant as his attacker. Mr. Bozant stated that he was "absolutely certain."
On cross-examination Mr. Bozant said that the attacker may have hurt his head as they fell backward. He had previously testified that the attacker ran with a limp after the fall. When asked about a goatee, Mr. Bozant indicated that the defendant had a goatee at the last hearing, but he did not recall a goatee at the time of the attack. He recalled telling someone that the attacker was wearing a button shirt, but he was not sure that it was Officer Gaines. He confirmed that he identified the defendant when the defendant was sitting in the back seat of a car. He said that he did not recall the color of the perpetrator's eyes or his shoes. Mr. Bozant did not recall saying that the attacker's shirt was blue; he thought it was a button shirt with some type of design. He noted that the only blood was from the cut on his hand, and he did not recall any blood on his neck.
Mr. Hatchett, a bartender at the Cajun Pub, testified that on the night of the robbery he was walking on Governor Nicholls and nearing Bourbon Street when a man ran around the corner and down Governor Nicholls. He could hear people screaming as he approached the corner. When asked if he got a good look at the man, Mr. Hatchett stated: "I saw the back *1245 of him. I saw the clothes he was wearing. I did not get a look at his face at all." Mr. Hatchett said the man was of average height and average build with dark, hair. He could not recall the clothes the attacker. was wearing; it had been too long since the event. Mr. Hatchett said that when he turned the corner onto Bourbon, there were two men who told him they had been mugged. As he was about to call the police, two mounted officers rode up. He and the two victims gave the officers a description, and the officers rode off to pursue the attacker.
Officer Patrick Schneider testified that he was patrolling on horseback on Governor Nicholls heading toward Bourbon Street. A subject ran by the officers on the sidewalk; he was running very fast. Although that seemed suspicious Officer Schneider stated that he had no reason to chase the man. Officer Gaines, who was riding a little ahead of him, was talking to three males who were saying that they had just been robbed. Officer Schneider turned and pursued the man he had just seen running down Governor Nicholls. The subject took a right at Dauphine and the officers briefly lost sight of him but some people on the street pointed to Barracks Street, and the officers turned left there. They did not see the subject, but certain that he could not have outrun the horses and therefore must be hiding somewhere, the officers searched for him. After approximately ten or fifteen minutes, the officers located the defendant hiding underneath a vehicle in the middle of the block on Barracks Street. After the defendant failed to comply with the order to come out from under the vehicle, Officer Schneider dismounted and pulled him out, handling the man cautiously because a broken bottle had been involved in the robbery. When asked if the officer recognized the subject when he emerged from underneath the vehicle as the man being pursued, Officer Schneider answered: "Yes." He clarified: "The same outfit that he had on, it just happened, so, it was the same outfit and the same guy I saw running on the sidewalk. That was him."
After handcuffing the defendant, Officer Schneider and the other officers searched for the victim's wallet which was not found on the defendant's person. Officer Schneider said he looked underneath the vehicle and "found just this one piece of a bottleneck near the tire hiding on the inside underneath the vehicle." Later, the officers went back to the 1100 block of Bourbon Street where Officer Breaux retrieved pieces of the same bottle, "same texture, green bottle, everything." Officer Schneider could not recall whether the defendant appeared intoxicated. Officer Schneider explained that it is difficult to get crime lab technicians out to a crime scene and, in any event, the officers knew they had the right guy because he ran past them and then they found him hiding. He identified the defendant in court.
On cross-examination Officer Schneider admitted that the running subject was almost a block ahead. When he reached the corner of Dauphine and Barracks, a bystander helped and showed the way. He said that he could not see the defendant's hand because cars were parked along the street. He admitted further that from a block away he could not see clothing details. However, Officer Schneider stated that he saw what the perpetrator was wearing when he ran past them He said: "He was just clad in blue. I just sawit was almost like a blue shadow running past you." The officer admitted testifying before in the case, and he admitted that he described the clothing as *1246 a blue shirt. Officer Schneider stated that the defendant said nothing when he emerged from under the vehicle. When questioned about not having the crime lab match the bottleneck and the pieces of green glass, the officer stated that the block on Barracks is not a tourist area, and there was no broken glass around. He admitted that he did not use gloves to pick up the broken bottle. He felt that this case did not warrant the crime lab because the officers retrieved the broken bottleneck from underneath the vehicle where the defendant was hiding and the pieces of glass from the crime scene. He did not recall whether the defendant was sweating or short of breath from running. On redirect examination Officer Schneider was asked if he had any doubt that the man under the car was the same man who ran past him fifteens minutes before, and he answered: "No doubt whatsoever, no."
Mr. Campagna, a retail manager, testified that he and Mr. Bozant were walking on Bourbon Street heading toward Mr. Bozant's place in the Marigny. He looked over his shoulder and saw a man walking behind him. A few minutes later he heard a glass bottle break and then saw the defendant holding the glass bottle to Mr. Bozant's neck and threatening to kill him unless Mr. Campagna gave him everything. Mr. Bozant fell backward and both men tumbled to the ground. Mr. Campagna stated that he tried to hand the wallet to the attacker, but it dropped to the ground. He stated that the street lighting was good and that he saw the attacker's face. He saw the robber pick up the wallet, head east on Bourbon Street for half a block, and then head north. Mr. Campagna stated that Mr. Bozant had a cut on the back of his right hand. He described the weapon as "the broken off top of a green beer bottle." There was no indication that the attacker was intoxicated. Once the attacker ran away, Mr. Campagna said he helped Mr. Bozant up and looked for a wound because there was a good amount of blood. He vaguely re called police officers coming from the intersection. He remembered that Mr. Hatchett came from around the corner, and he gave the officers a description of the robber. According to Mr. Campagna, the attacker was wearing a "blue button up shirt, blue shorts." A few minutes later, one of the officers made his way back toward the crime scene and asked the three men to accompany him to the place where the attacker had been found.
Mr. Campagna said the three men were asked to give statements and then to take a look at the person who had been apprehended. He said: "And at the time I was sure beyond doubt that thatthat the two people that we're speaking of were the same person. The person who attacked me was the same person who the police had in custody." The robber was apprehended about three blocks from the crime scene. When shown the black and white booking photo of the defendant, Mr. Campagna said that was the attacker. He stated that he had never seen that photo before. He also identified the defendant in the courtroom. He explained that the man in the courtroom did not look as he did on the night of the robbery. Mr. Campagna said: "Well, I remember him being heavier, which is evident in the picture I was just shown. There was very little facial hair. . . . I think I said there might have been a five o'clock shadow, more or less, maybe one or two days growth. And I believe he had a lot more hair at the time."
On cross-examination Mr. Campagna was asked if he had been asked in court *1247 previously to identify the defendant. Mr. Campagna asked whether counsel was referring to the first trial or the hearing on the motion to suppress the identification. Counsel responded that he was referring to the first time and said: "You were asked, right? You weren't asked at trial. You were asked at the Motion to Suppress, right?" After a bench conference defense counsel asked if Mr. Campagna had failed to make an identification in the courtroom. Mr. Campagna admitted that he had not identified the defendant at that hearing. Counsel noted that Mr. Campagna had said the facial hair on the defendant had caused his inability to identify the robber. Mr. Campagna conceded that the defendant had a goatee in the booking photo, but he said there were only a couple days of growth of hair. When asked if the defendant had a goatee the last time Mr. Campagna saw him, the witness answered affirmatively, but qualified that it was "significantly more" growth. Mr. Campagna stated: "Enough certainly to change the physical appearance to false recognition, especially after not seeing him for fourteen months." He thought he had told the police officers about the facial hair. He claimed that he told police officers that he had a few dollars in the wallet, not fifteen dollars.
On redirect examination Mr. Campagna again stated that he was "absolutely certain" when he identified the defendant twenty minutes after the attack. On recross-examination he admitted that he had never given this explanation before. He explained that, he felt more comfortable on the stand. On redirect examination Mr. Campagna answered affirmatively when asked if he always answered honestly.
Officer Gaines was recalled to the stand by defense counsel to state that he wrote the police report and to identify the report. Officer Gaines did not recall information from Mr. Bozant and Mr. Campagna relating to the perpetrator's facial hair. He did not recall a description that the shirt was button up, and although he did not ask the victims to identify the broken bottle, another officer may have asked them to identify it. Officer Gaines noted that the description section of the report noted a blue button shirt but on redirect conceded that the report was written after the defendant had been apprehended and that the information about white tennis shoes came from his observation of the attacker.
The defendant concedes that an armed robbery occurred, but claims that he was not involved, arguing on appeal that the jurors should have had a reasonable doubt that he committed the armed robbery because Mr. Campagna and Mr. Bozant saw the attacker only briefly at night during a struggle, Mr. Campagna had been was unable to identify him at his first trial (which ended in a hung jury), Mr. Hatchett had only seen him primarily from the back, the police officers lost sight of the assailant during the chase, and Mr. Hatchett, Mr. Bozant, and Mr. Campagna identified him fifteen minutes after the robbery after he had been handcuffed and placed in the back seat of a car for the show-up. The defendant also points to the lack of physical evidence tying him to the crime (Mr. Campagna's wallet was never found) and the fact that the beer bottle found under the vehicle and the pieces of glass from the 1100 block of Bourbon Street were never tested for blood or fingerprints.
Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the crime of armed robbery were proven beyond a reasonable *1248 doubt and that the State negated any reasonable probability of misidentification. Mr. Bozant testified that a man broke a beer bottle behind him as he walked on the sidewalk and placed it at his neck threatening to kill him if Mr. Campagna did not turn over everything he had. Mr. Campagna testified that he handed over his wallet, and the attacker ran down Bourbon Street onto Governor Nicholls. Thus, the State proved beyond a reasonable doubt the elements of the crime of armed robbery. Officers Gaines and Schneider, the mounted officers, testified that the robber ran past them as they were patrolling on horseback. Within minutes Officer Schneider was in pursuit, and Officer Gaines followed. Although he lost sight of the running assailant at one point and eventually had to search for the hiding suspect, Officer Schneider testified that the man he pulled from underneath the Nissan Xterra was the man who had run past him on Governor Nicholls Street. Both officers stated that they clearly saw the defendant as he ran past them, and they identified the defendant in court. Mr. Bozant, who was attacked from behind, stated that he saw the assailant under a streetlight moments before the attack. Mr. Bozant said he was also very close to the attacker's face as they fell backward. Mr. Bozant identified the defendant about fifteen minutes after the robbery in a show-up after the officers apprehended the robber. Although the defendant was seated in the back seat of a car at the time, Mr. Bozant was absolutely certain the defendant was the man who had attacked him. He also identified the defendant in court at the pretrial hearing and at trial. Mr. Campagna testified that he saw the armed robber's face as the assailant held the broken bottle to Mr. Bozant's neck. He identified the defendant at the show-up fifteen minutes after the robbery and was absolutely certain of that identification. At the motion to suppress hearing which was held over a year after the robbery, Mr. Campagna was not able to identify the defendant. He explained at the trial, however, that the defendant was much heavier with very little facial hair at the time of the crime but at the hearing was thinner and had a goatee with a lot of facial hair. At trial, Mr. Campagna identified the defendant's booking photo because the photo looked like the robber without the physical changes. He also identified the defendant at trial.
Accordingly, the jurors heard that the robbery happened very quickly at night, but that Mr. Bozant saw the defendant before the attack. They heard that Mr. Campagna was looking at the assailant as he held Mr. Bozant. They were told that Mr. Campagna did not identify the defendant at the motion to suppress hearing, but also heard his explanation. The jurors heard Mr. Hatchett's testimony that he saw the perpetrator running past him. Mr. Bozant, Mr. Campagna, and Mr. Hatchett identified the defendant right after the crime in a show-up and at trial. The jurors were aware that the officers lost sight of the robber for a time, but they also heard the officers testify that they saw the robber as he ran past them. Officers Gaines and Schneider testified that they were sure that the defendant was the man who ran past them on Governor Nicholls.
Conclusion
For the foregoing reasons, the defendant's argument on appeal is without merit. Viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the crime of armed *1249 robbery were proven beyond a reasonable doubt and that the State negated any reasonable probability of misidentification. Accordingly, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The pieces of glass and bottleneck, which were not tested for fingerprints, were introduced into evidence.
[2] On redirect examination, however, Officer Gaines stated that the discoloration on the cheek and forehead could have been bruises or grease marks.