NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 17-548

STATE OF LOUISIANA

VERSUS

JEFFERY FISHER

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 16-K-0114-B
HONORABLE ADAM GERARD CASWELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

D. KENT SAVOIE
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Marc T. Amy, D. Kent Savoie, and Van H. Kyzar, Judges.

AFFIRMED.

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P.O.Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT-APPELLANT:**
      **Jeffery Fisher**

**Jeffery Fisher**
**Louisiana State Prison**
**Main Prison Hickory - 1**
**Angola, LA 70712**
**APPELLANT**

**Earl B. Taylor**
**27th JDC District Attorney**
**P. O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-3041**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Jennifer Ardoin**
**Assistant District Attorney**
**P. O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**SAVOIE, Judge.**

On March 29, 2016, Defendant, Jeffery Fisher, was charged by grand jury indictment with one count of second degree murder, a violation of La.R.S. 14:30.1.[1] After a three-day jury trial, Defendant was found guilty of second degree murder by a unanimous jury on February 23, 2017. A "Motion for Judgment of Acquittal or in the Alternative Motion for New Trial" was filed by Defendant and denied by the trial court after a hearing on March 9, 2017. Defendant waived sentencing delays and was sentenced that same date to life at hard labor without benefit of parole, probation, or suspension of sentence.

A motion for appeal was filed on March 21, 2017, and granted on that same date.[2] Before this court is a brief filed by Defendant alleging one assignment of error as to the sufficiency of the evidence.[3] As will be discussed, this assignment of error lacks merit.

## FACTS

The State alleges that on January 5, 2016, Defendant went into a store in Opelousas called "Bikini Betty's" and shot the store clerk, Walid Mohamed Alqohaif. Mr. Alqohaif died of a gunshot wound.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENT OF ERROR

Defendant asserts the evidence was insufficient to prove beyond a reasonable doubt that he committed the second degree murder at issue in this case.

---

[1] The indictment was later amended to correctly reflect the citation as La.R.S. 14:30.1.
[2] Another motion for appeal was filed the same date and granted on March 22, 2017.
[3] Defendant was given until August 21, 2017, to file a pro se brief. To date, no pro se brief has been filed.

Defendant's sole contention is that the State failed to prove his identity as the perpetrator.

## ANALYSIS

### Standard of Review

The analysis for insufficiency of the evidence claims is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

### Evidence at Trial

The State's key witness was Devante Lemon, who was eighteen at the time of trial. Mr. Lemon lived with his grandmother following the deaths of his parents. Mr. Lemon indicated that around 5:00 p.m. on the day of the murder, he walked to a local store. At first, he stated that he went to a store called "Amanda's" and that he may have gone to another store called "Bikini Betty's" earlier in the day. Mr. Lemon testified that he went to "Bikini Betty's" every day to get snacks. When asked if he went to "Bikini Betty's" that afternoon or evening, Mr. Lemon responded, "No, ma'am. I ain't went like until like when the man got killed, that was the only - - like that's when I went. . . . Like around - - it was around 5:00 or 6:00."

Mr. Lemon testified that he walked to "Bikini Betty's," passing Defendant's mother's house on his way. Mr. Lemon also testified that when he was walking to the store, he saw Defendant walking behind him.[4] Mr. Lemon said that when he reached the store parking lot, he saw "Scooty Woo." While Mr. Lemon and "Scooty Woo" were talking, Defendant walked up and asked Mr. Lemon to hold a jacket. Mr. Lemon said that he saw Defendant walk to the back of the store, and Mr. Lemon put the jacket down. Mr. Lemon identified State's Exhibit 5 as the jacket Defendant handed him.

Mr. Lemon indicated that, after talking with "Scooty Woo" a few minutes, Mr. Lemon went into the store and saw "Mr. Wally." The State subsequently referred to "Mr. Wally" as "Mr. Walid." According to Mr. Lemon, he and Mr. Walid always "clowned" around. When asked if he was able to finish his transaction to buy candy, Mr. Lemon responded, "No, ma'am," and explained:

> A.     Like I was about to - - like I was counting my change, then Jeffery walked in. Like he walked in the store and all I hear is "don't move" and like I heard a gun cock, and then when I heard that, like I was running, trying to get out the store. Then I heard - - like, I get to the door and I hear the gunshot, and when I hear a gunshot, I was running back down the way I came, to go to my house.

While looking at a picture of the counter in "Bikini Betty's" during trial, Mr. Lemon stated that he was 5'4" to 5'5" in height and that the counter was almost to his chest. According to Mr. Lemon, Mr. Walid was right in front of the counter. Mr. Lemon indicated that he saw Defendant pointing a black gun at Mr. Walid when Defendant said "don't move." Mr. Lemon said that he left his change on the counter and ran, and, as he was running away, he heard the gun go off. Mr. Lemon stated that the last time he saw Mr. Walid was as Mr. Walid was falling. When asked if he was certain the person who shot Mr. Walid was Jeffery Fisher, Mr. Lemon replied, "Yes, ma'am." Mr. Lemon indicated that Defendant was

---

[4] During trial, Mr. Lemon referred to Defendant as "Jeffery." The State referred to Jeffery as Defendant.

3

someone he knew from the neighborhood and that he was able to pick Defendant out of a lineup for police.

When the State asked Mr. Lemon if Defendant said anything to him when he was leaving the store, the following colloquy ensued:

> A.    I was running like, I was running down the street and all I hear somebody saying "N[ _ _ _ _ _], you better not tell nobody," or something.  He was screaming, "N[ _ _ _ _ _], you better not tell nobody," and I was like "All right, I ain't gonna tell nobody."  I was so scared, I was like, "All right, I ain't gonna tell nobody."
>
> Q.    Did you say that or did you think that?
>
> A.    I was running like, I was running like and I was like I think I screamed, "All right."

Mr. Lemon testified that on his way home, he passed "Scooty Woo" and cut through "Rabbit's" yard.  He indicated that he did not see any vehicles parked along the street on which he was running.  Mr. Lemon said that he did see "a little Jeep" pass on the side of him when he was running on Liberty Street.  When asked to describe the vehicle, Mr. Lemon said it was "bluish/gray, like a tan, blue and gray . . . little Jeep-type vehicle."  Mr. Lemon further described the vehicle as a family vehicle that was smaller than a SUV.  He identified the vehicle shown in State's Exhibit 7 as being similar to the vehicle that passed him.  According to Mr. Lemon, the following occurred when he saw the vehicle:

> A.    I was running then like I stopped to see who it was, then - - I stopped 'cause like I was running and I seen a car coming, then I stopped, then I seen like the car passed and it was him, then I started running again, like I didn't want to show nobody I was scared.  Then he was just saying, "N[ _ _ _ _ _], you better not tell," so I didn't want to show him I was scared, so I stopped running.

According to Mr. Lemon, when he arrived at his grandmother's house, he told his grandmother and other family members that "somebody just got shot at the store."  He said that he called his uncle who lives in Arkansas to come and get him because he was afraid Defendant would start looking for him.  Mr. Lemon's uncle drove from Arkansas and took Mr. Lemon back to Camden, Arkansas within a

4

couple of days of the shooting. At some point, Mr. Lemon was apprehended by authorities in Camden and taken to the local sheriff's department. Officers from the Opelousas Police Department drove to Arkansas, questioned Mr. Lemon, arrested Mr. Lemon for first degree murder, and brought Mr. Lemon back to Opelousas.

During the course of his questioning by the Opelousas officers, Mr. Lemon said that he saw Defendant shoot the victim. Mr. Lemon denied going into the store with Defendant and denied ever talking with Defendant on the phone. According to Mr. Lemon, he recognized Defendant in the first lineup presented to him but did not see Defendant in a second lineup.

Mr. Lemon testified that he ran into Defendant in jail, and the following occurred:

> A.    Like we was in jail, and like he come, he was like, uh, "I don't know if you know, but they trying to give both of us life." I guess he wanted to tell me that to make me scared or something, so he was like, uh, he was like, "I don't know if you know, but they trying to give both of us life, so you sign the affidavit." He wanted me to sign the affidavit, so he said, "You sign the affidavit, and we gonna both go home," but I was like, "No, I didn't do nothing, so you sign that," and he was like, "No, I gotta sign it first 'cause I wrote the statement."

> Q.    Did he tell you anything else, any other type conversation like that?

> A.    No, ma'am.

> Q.    Did he threaten you in any way in jail?

> A.    No, ma'am.

> Q.    Did y'all have much contact in jail?

> A.    No, ma'am.

After a break, Mr. Lemon clarified his testimony with the following:

> Q.    Mr. Lemon, when we broke, you were about to explain something to us that happened to you while you were in jail with the defendant. Can you tell the jury what you told us on break?

A.     Like I was in the - - me and him, like we was in jail, and like the, he was like "I don't know if you know, but they trying to give both of us life." So I was like - - I guess he was trying to scare me or something, so he was like - - I was like, uh - - no, he told me, so if I sign the affidavits we could both go home, so I was telling him, I was like "No, you the one did it, so you sign the affidavits so I can go home," and he was like "No, you the one that wrote the statements," and I was like well we ain't - - nobody gonna sign it.

Q.     So you weren't going to change your - - you weren't going to change what you told the police?

A.     Ma'am?

Q.     You were not willing to change what you told the police?

A.     No, ma'am.

Q.     Even if it meant you going home?

A.     Ma'am?

Q.     Even if it meant you going home?

A.     No, I was gonna go home, but like what you talking about, the affidavits part?

Q.     Yes.  He suggested to you that if you wrote that affidavit, you'd get to go home?

A.     Yes, ma'am.

Q.     And you did not buy into that?

A.     No, ma'am.

Q.     And you refused to do it?

A.     Oh, yeah.

The State concluded its direct examination of Mr. Lemon by asking him if he had been promised anything for his testimony, if he had been threatened, and if he was telling the jury the truth.  Mr. Lemon responded negatively to the first two questions and affirmatively to the last.

On cross examination, Mr. Lemon stated that he did not specifically remember, but that he probably did tell police that when he walked into "Bikini Betty's" on the day in question, Mr. Walid said, "Hurry up, you little f[ _ _ _ _ _]."

6

Mr. Lemon explained that he and Mr. Walid clowned around. Mr. Lemon further explained:

> A. When we would go in that store, that man would do this with everybody, and every time I would go in the store, I would clown with him. Me and this man was cool. I don't have no business killing this man. For what? We clown all - - what I need to kill that man for? And I don't remember that - - we probably would, but I don't remember what you saying.

When defense counsel accused Mr. Lemon of not telling police that he saw Defendant when the police first asked him, Mr. Lemon said, "I told 'em I ain't really like - - I couldn't recognize him. . . . But once he got to me and 'Scooty Woo,' I knew that was him." Mr. Lemon also acknowledged that he did not tell the police about Defendant giving him the jacket until his fourth interview with police. Mr. Lemon explained, "No, I didn't had [sic] to tell 'em [sic] that, 'cause I knew it was Jeffery. I knew who killed the man. Why would I have to tell them something about the jacket?" After the State objected to defense counsel's mischaracterization of Mr. Lemon's statement, the following colloquy ensued between defense counsel and Mr. Lemon:

> Q. I'm going to draw you back to the first interview. Lieutenant - - not Lieutenant, Sergeant Leblanc asked you did someone exchange something.
>
> A. No, we didn't exchange nothing. He gave me that jacket.

Defense counsel also pointed out that during Mr. Lemon's first interview with the police, he did not tell the police that "Scooty Woo" had asked Defendant, "You're trying to rob me?" Defense counsel also noted that Mr. Lemon had failed to tell police until his fourth interview that Defendant was wearing a black bandana. As for Defendant's statement that Mr. Lemon better not tell anyone, the following testimony occurred:

> A. 'Cause look, when I ran out - - I don't know if he - - after he killed the man, I don't know what, but look, I ran out the store. He must have thought I was gonna go tell or something. So I'm running, I'm running, when he seen me run out the store, the man, he come

7

running out the store behind me. I don't know if he was trying to kill me or what, man. This man hollering about "N[ _ _ _ _ _], you better not tell nobody." I'm running home.

. . . .

Q.     When you ran out the store, you stated that he, Mr. Fisher, said, "N[ _ _ _ _ _], you better not tell nobody."

A.     Yes, sir.

Q.     Where were you when you was running out the store?

A.     I ran across the street.

Q.     And where was Mr. Fisher when he said that?

A.     He was like behind me, like behind me. I was running. All I hear is "N[ _ _ _ _ _], you better not tell nobody."

Q.     Did he cross the street yet?

A.     I didn't even know. I don't even know if he was across the street yet.

Q.     Do you remember saying - - now, did he yell anything at you after that?

A.     No, sir. All I remember is "N[ _ _ _ _ _], you better not tell nobody."

Q.     Okay. Do you remember telling the police that he was in his Jeep and he yelled at you, "N[ _ _ _ _ _], you better not tell nobody."

A.     No, sir.

Q.     If I told you we have that on video, would you have any reason to disagree with that?

A.     Yes, sir, 'cause I ain't tell 'em - - when he was in the vehicle, he ain't said nothing. Yes, sir, you can bring up the video.

Mr. Lemon stated he saw the vehicle when he was on Liberty Street, before he passed Defendant's mother's house. Mr. Lemon also acknowledged that neither he nor his grandmother called to report the shooting. Mr. Lemon stated that he was scared since he had seen the shooting and Defendant had warned him not to tell anyone.

8

On re-direct examination of Mr. Lemon, the State introduced videos of all four of Mr. Lemon's interviews into evidence – State's Exhibits 13, 14, 15, and 16.[5]  In State's Exhibit 13, Mr. Lemon was interviewed for the first time in Camden, Arkansas.  During that interview, Mr. Lemon told police that, on the day in question, he walked to the store and saw "Scooty Woo" outside of the store.  He stated that after he went into the store, some "N[ _ _ _ _ _]," came in the store and said, "Don't move."  Mr. Lemon indicated that he heard a gunshot as he was running and that a person hollered at him that he better not tell anyone or he would do something to Mr. Lemon.  Mr. Lemon stated that he ran to his house.  According to Mr. Lemon, he was scared and called his uncle to come get him.  The police asked Mr. Lemon if he talked with anyone else before he went into the store, and Mr. Lemon said he did not talk to anyone else.  When asked who was in the store, Mr. Lemon said a "n[ _ _ _ _ _]" they call "Jeff."[6]  When the police told Mr. Lemon they saw him talking to someone else in the parking lot, Mr. Lemon continued to deny talking with anyone other than "Scooty Woo."

Mr. Lemon also denied exchanging something with anyone.  Mr. Lemon specifically denied talking to Jeff outside the store by the carwash.  He told the police that Jeff was from New Orleans and was crazy.  Mr. Lemon said he did not hang out with Jeff and that he was not in a vehicle with Jeff.  The police told Mr. Lemon that some people had said Mr. Lemon and Jeff were together, but Mr. Lemon continued to deny being with Jeff.  Mr. Lemon stated that while he was running, a "little Jeep" passed him.  When asked when he heard the shot, Mr. Lemon said he was almost out of the parking lot.  Mr. Lemon stated that he thought Jeff was going to start shooting at him.  Mr. Lemon described what Jeff

---

[5] No transcripts of the videos were sent with the appellate record.  We have reviewed each video and summarized the content of each.

[6] Although it is apparent that the "Jeff" Mr. Lemon is referring to is Defendant, we will use "Jeff" when summarizing the interviews for the sake of accuracy.

was wearing as black jeans and a t-shirt. According to Mr. Lemon, he always saw Jeff walking by himself, not in a car. Mr. Lemon vehemently denied going into the store with Jeff.

When asked if Jeff would tell them that Mr. Lemon was the one that shot the victim, Mr. Lemon said the cameras would show that Jeff was the shooter. When asked again about whether he talked with Jeff in the parking lot, Mr. Lemon said Jeff was talking with "Scooty Woo," but he did not know what they were talking about. Even though Mr. Lemon admitted to being in the same area, he denied talking to Jeff in the parking lot. Mr. Lemon was inconsistent about whether he was in the store when the victim was shot. Mr. Lemon agreed to give a sample of his DNA, and a sample was taken during the interview.

During the interview, the police showed Mr. Lemon a photo lineup on a phone and stated that a hardcopy would be shown to him in Opelousas. Mr. Lemon identified "number two" as Jeff. Mr. Lemon consistently stated that he did not call police because he was scared for himself and his family. Mr. Lemon denied talking with Jeff after the shooting.

In State's Exhibit 14, Mr. Lemon was interviewed by Detective Thomas on January 9, 2016. During this interview, Mr. Lemon's description of the events was substantially the same as the description given in his interview in State's Exhibit 13. Mr. Lemon said he heard the gun shot as he was running out of the store but he did not see the shot. Mr. Lemon said that Jeff had threatened to kill him if he told anyone about the shooting. He indicated that the only person he saw outside of the store was "Scooty Woo." Mr. Lemon also denied seeing Jeff in a car. In a photo lineup presented during this interview, Mr. Lemon identified the person he saw in the store.

In State's Exhibit 15, Mr. Lemon was again interviewed by two officers. The officers stressed that Mr. Lemon needed to tell the truth. Mr. Lemon denied

10

ever calling Jeff either before or after the murder. According to Mr. Lemon, he had a cell phone, but it was off on the day of the murder. When asked if Jeff asked him to go into the store with him, Mr. Lemon said "no." Mr. Lemon again denied having a conversation with Jeff in the parking lot. He acknowledged seeing Jeff in the parking lot, but indicated that no one talked to Jeff. Mr. Lemon said that he did not see where Jeff had run after the shooting. When asked if Jeff pulled up beside him in a vehicle, Mr. Lemon said, "No, sir." Mr. Lemon said he did see a vehicle pull up near Jeff's mom's house. Mr. Lemon was shown two lineups during this interview, but said that he did not recognize anyone in them. Mr. Lemon denied exchanging a sweater or shirt with Jeff. Mr. Lemon insisted that he heard the victim get shot but that he did not see the shot.

In Mr. Lemon's final interview, State's Exhibit 16, Mr. Lemon again recounted the events of the day of the murder. In this interview, Mr. Lemon said that he saw "Scooty Woo" in the parking lot and that Jeff walked up while he was talking to "Scooty Woo" and asked Mr. Lemon to hold a coat for him. Mr. Lemon said that he threw the coat on the ground. According to Mr. Lemon, "Scooty Woo" asked Jeff if he was trying to rob them. He said they were standing by the carwash at the time. Mr. Lemon indicated that when he threw the coat on the ground, Jeff was about to walk away. As for the shooting, Mr. Lemon said he ran out of the store when he heard the gun cock. Mr. Lemon said Jeff did not take any money or anything but ran out of the store after Mr. Lemon. Mr. Lemon said Jeff parked a car on a side street and passed Mr. Lemon while in the car, but that Jeff did not say anything to him from the car. Mr. Lemon described the jacket given to him by Jeff as black with some white on it, and he described the vehicle that Jeff was in as a "Jeep like" vehicle. Mr. Lemon indicated that he knew Jeff because Jeff's mom lived near Mr. Lemon's cousin. Mr. Lemon also told police that Jeff was wearing a black bandana in the store.

11

During his re-cross of Mr. Lemon at trial, defense counsel introduced Defense Exhibit 5. Defense counsel asked Mr. Lemon if he remembered an earlier dialogue at trial wherein defense counsel asked Mr. Lemon some questions about whether Defendant was in a Jeep. Mr. Lemon testified Defendant was not in the Jeep. At that time, defense counsel played Defense Exhibit 5 for the jury.

Defense Exhibit 5 contained off-screen interviews of Mr. Lemon and Defendant. The interviewing officer stated that Mr. Lemon was on Liberty Street when Defendant warned him not to tell anyone. While looking at Defendant, the police officer said "and you was in your Jeep." At trial, the following colloquy took place after Defense Exhibit 5 was played for the jury:

A.    I didn't say he was in the Jeep. The cop said that.

Q.    The cop did say Liberty Street, right?

A.    Yes, sir, but it was Hardy Street. He was on Hardy Street, running after me.

Q.    Liberty Street is not close to the store when you said he was walking out.

A.    No, Liberty - - I was running down Liberty Street, and he was behind me, but when the cop said that - - he said on the video that, uh, he said I was - - no, he was in the Jeep, and he hollered - -

Q.    You didn't say, wait, wait, wait, cop, you got all this all wrong, that's not what happened, right?

A.    No. The man - - the cop said I misheard it on the - -

Q.    You misheard it.

A.    Sir, he said - - this what he said, he was like Jeffrey stopped and said he hollered and he pointed at me, and I was like he hollered, "N[_ _ _ _ _], you better not tell nobody." But he wasn't in a Jeep, he was run - - no, I was running.

Willie James Robins, who is known as "Scooty Woo," also testified at trial. He stated that on January 5, 2016, the day in question, he washed cars at "Bikini Betty's," and it appears from his testimony that "Bikini Betty's" is next to a carwash. Mr. Robins indicated that, on the day in question, he saw Mr. Lemon at

the carwash, as well as another person near the carwash who was wearing a white jacket. Mr. Robins described the jacket as mostly black with white patches, and said that the person handed the jacket to Mr. Lemon. When the State showed Mr. Robins a jacket labeled State's Exhibit 5, Mr. Robins identified State's Exhibit 5 as the jacket he remembered. Mr. Robins stated that he did not know the man that handed Mr. Lemon the jacket but described him as tall. When asked at trial if he could identify Defendant as the person who gave Mr. Lemon the jacket, the following colloquy occurred between the State and Mr. Robins:

Q. There's a gentleman sitting, in the white shirt, next to Attorney Willis, who also has that navy, that blue suit.

A. Okay.

Q. Do you recognize the guy in the white shirt?

A. Not really.

Q. No?

A. No, ma'am.

Q. Do you recognize him to be the guy you saw that night?

A. I believe so. Him and the Lil' Lemon guy was together.

Q. Okay.

A. Yeah, I remember that, you know.

Defendant was then asked to stand, and the State's attorney asked Mr. Robins if the person who was with Mr. Lemon was about the same height as Defendant. The following colloquy took place:

A. Probably a little shorter, probably a little shorter. Like I said, I wasn't focused on it, you know, because I was getting ready to leave.

Q. Okay, okay, but that guy right there, do you have any idea that he was similar to the guy you saw that night?

A. Yes, ma'am.

Q. Okay, and you saw him hand this shirt to Lemon?

13

A.     Yes, ma'am.

Q.     How familiar were you with Lemon?

A.     I see him around all the time, you know.  He always around that area.

However, Mr. Robins indicated that he was not familiar with the "other fellow" and had not seen him before the night in question.

Mr. Robins testified that when he started to walk home, "Rabbit" called him over to talk.  When the State asked where Mr. Robins saw Mr. Lemon go, if anywhere, Mr. Robins stated:

A.     Well when I came this way and I hollered at "Rabbit," that's when I seen him.  I looked back and that's when I seen the Lil' Lemon dude right there, where that car at.

Q.     Where the car is?

A.     Yes, ma'am.

Q.     Did you see Lemon go in that store?

A.     No, I didn't see him go in the store, but I seen him coming from the store, you know.

Q.     Did you see where the defendant, that man, go?

A.     No, I didn't see, I didn't see where he go.

Mr. Robins indicated that he did remember that someone passed him in a car and hollered at him.  The State asked Mr. Robins if he could have stated in a previous statement that he saw Mr. Lemon go into the store.  Mr. Robins acknowledged that his memory could have been better when he gave a previous statement.  However, he testified, he did see Mr. Lemon running.  Mr. Robins saw a car pass him and heard someone honk a horn at him.  When he turned to wave, Mr. Robins saw Mr. Lemon running and then later saw Mr. Lemon running passed "Rabbit's" yard.

The State asked Mr. Robins if he noticed anything about the street behind his house when he was talking to "Rabbit."  Mr. Robins testified that he saw a

14

parked vehicle behind his neighbor's house. Mr. Robins said he thought the vehicle was a Ford, but he could not make out the color because he was not paying enough attention. According to Mr. Robins, he did not see Defendant again. There was a vehicle at the corner of Burton and Hardy with someone standing beside it. Mr. Robins did not recognize the person because he had a hood on. When asked if he knew it to be someone different than Defendant, Mr. Robins replied, "No. . . . I'm not sure who it was."

With respect to the jacket at issue, Mr. Robins testified that he looked away when the jacket was handed to Mr. Lemon. Another person, "Little Richard," was also present with Mr. Robins, Defendant, and Mr. Lemon, but "Little Richard" left in a car with someone. "Little Richard," Mr. Robins testified, passed away a few months later.

On cross examination, defense counsel asked Mr. Robins if he would be able to identify Defendant as the person he saw if he was in the middle of Wal-Mart. Mr. Robins responded:

> A.   Well, to be very honest with you, I did a lot of time in the marines, and I worked with a lot of people, and I'm good with faces. If I stand up there and talk to you, and they have a million people in the store, ten people out of that million, at least ten million people, ten people out of that, if I see them regularly passing in front of me, I will recognize them.
>
> Q.   Okay. I want you to - - so you would recognize Mr. Fisher in Walmart, if you saw him just passing by, as the person that you saw a year ago at Bikini Betty's? Is that what you're saying?
>
> A.   No. What I'm saying is that I have a lot of friends, and I've been knowing people since I was a little boy, and they can stay gone a hundred years and I could still recognize the person.

Mr. Robins was questioned further about a prior statement he had given to police wherein he identified "Lemon" and stated that a second individual appeared to be with Lemon. That individual, Mr. Robins stated in his previous statement, gave Mr. Lemon a jacket. When asked by defense counsel if he was now saying

15

the second individual was Defendant since he pointed Defendant out in court, Mr. Robins responded, "Yeah." Later, defense counsel asked Mr. Robins if he was certain he saw Defendant with Mr. Lemon on January 5, 2016, and Mr. Robins responded:

> A. I'm not certain of it, but I now - - I know they had to be together. They had to be together.
>
> Q. No. You're certain that you saw this person?
>
> A. Well, it's been a year, it's been a year and something. Like I said, I don't forget a face, but his hair might have been a little longer then. His hair might have - -
>
> Q. How long?
>
> A. I don't know. Maybe it might have been longer, or whatever, you know.
>
> Q. Okay. How was his hair?
>
> A. I don't remember. I mean my hair is short. I mean it's longer than this. It could have been my size, it could have been just a little bit of hair, what you have on your head, and what he have [sic] on his head. It could have been any part of the hair.
>
> Q. How was his nose?
>
> A. How was his nose?
>
> Q. Yes, sir.
>
> A. I don't know.
>
> Q. How was his eyes?
>
> A. I don't know. It was dark, it was getting dark.
>
> Q. It was getting dark?
>
> A. Yeah, that's right.
>
> Q. Right?
>
> A. Yes, sir.
>
> Q. And I think you stated that to the police, that you couldn't tell who the second person was, because it was getting dark, right?
>
> A. That's right.

Q.     In fact, you told the police officer, Officer Harris, when he asked you could you recognize the second person, you said, "I don't know. It's gonna be kind of tight."

A.     Because we was focused - -

Q.     Listen to my question.

A.     Because we was focused on this picture.

After being shown his video-taped interview introduced as Defense Exhibit

2, the following colloquy occurred between defense counsel and Mr. Robins:

Q.     Now, I want to draw you to Brandon Harris is now giving you photographic lineups. Do you remember that?

A.     Yeah.

Q.     And he's trying to figure out if you can identify that second person, right?

A.     I guess, sir.

Q.     Does that kind of ring a bell to you what's going on?

A.     Well, what I'm looking at right now, I thought we was [sic] looking at the Lemon pictures right now. What is we looking at right now?

Q.     We're looking at the second person.

A.     The second person.

Q.     That's what Mr. Harris told you.

A.     Yeah.

Q.     You appeared to understand that.

A.     Uh-huh.

Q.     Okay?

A.     Uh-huh.

        . . . .

Q.     You said you didn't want to get nobody in trouble.

A.     That's right.

Q.     You wasn't sure, right?

17

A.    Yeah.

Q.    Because the last thing you want to do is for you to put the wrong guy away for the rest of his life, because you're not sure.

A.    Well, I wouldn't want to do that to nobody.

Q.    I understand.

A.    Nobody.  I mean, you know, I understand - - what mostly I seen like I told you, like I told the D.A., that I seen the Lil' Lemon dude running.

Q.    You just saw Lemon.

A.    Yeah.

Q.    Right?

A.    Yeah.

Q.    You didn't see this other guy.

A.    But I seen somebody standing by the truck.

Q.    You saw a person?

A.    That's right.

Q.    Right?

A.    That's right.

Mr. Robins also recalled that he could not pick the second person out of a photo lineup.  When shown the photo lineup at trial, Mr. Robins said he believed he now saw Defendant in the lineup.  Mr. Robins again testified that he did see the second person exchange a sweater with Mr. Lemon but did not see the second person go into the store.  Mr. Robins testified that he saw Mr. Lemon run from the store but did not see the other person run from the store.  Mr. Robins indicated that when he saw Mr. Lemon running, Mr. Lemon was running full speed and cut in front of "Rabbit's" yard.  The following colloquy then took place:

Q.    And you saw the other guy, you said the driver's side of the vehicle, right?

18

A.     The guy, he was standing up on the side of the vehicle.  That's what I said, he was standing on the side of the vehicle.

Q.     And then he yelled, to the Lemon guy, something.

A.     Something, yeah.  I didn't hear what he said.

On re-direct examination, Mr. Robins clarified that he did not see Mr. Lemon and the second guy "exchange" anything; but rather, he saw "[D]efendant" give Mr. Lemon a jacket.[7]  Mr. Robins stated that he left, so he did not see what Mr. Lemon did with the jacket.  Mr. Robins further clarified that "Little Richard" left before "[D]efendant" or the "second guy" walked up.  The following colloquy took place between the State and Mr. Robins regarding Mr. Robins' identification of Defendant as the "second guy:"

Q.     Today, in court, you have him in person.  Do you recognize this person as being the second person that was out there that night?

A.     I'm not sure, ma'am.  I'm gonna be honest, but like I said, he was tall and he was dark.

Dr. Christopher Tape, who was accepted as an expert in forensic pathology, had performed the autopsy of the victim, Walid Mohamed Alqohaif.  Dr. Tape determined the cause of death was a gunshot wound to the head.

Patrick Green, who is known as "Rabbit," also testified at trial.  He stated that he recognized Mr. Robins as "Scooty Woo."  Mr. Green recalled that on the day of the murder, he saw a "white like SUV", that he did not recognize, parked in an unusual spot.  Mr. Green said that he saw the shadow of two men in the vehicle but never saw anyone outside of the vehicle.  According to Mr. Green, Mr. Robins told him the following:

A.     We was [sic] just back here in my backyard talking, and he had told me some guys had just broke into a guy's house like further down the street, and that they had went into that store and took something and they ran - - some guy ran through my front yard, for me to watch out.

---

[7] The State referred to the "second guy" as "[D]efendant" in its questioning of Mr. Robins.  No objection was made, and Mr. Robins did not refute the reference.

Q.     So he was talking about some trouble?

A.     Yeah, that had just happened in that area.

When asked if he saw anyone running in the area, Mr. Green replied, "No, no. . . . When I got there, I guess it had already happened."

The State resumed questioning Mr. Green about the vehicle he saw parked in an unusual spot. Mr. Green said the vehicle was "like a white SUV" with a Buick symbol in the front. The State introduced four photographs of a Buick Rendezvous as State's Exhibit 7. Mr. Green testified that the vehicle in State's Exhibit 7 was similar to the vehicle he saw on the night in question.

Sergeant Crystal LeBlanc with the Opelousas City Police Department investigated the murder at issue. According to Sergeant LeBlanc's report, someone reported the shooting at 6:22 p.m. The victim was found behind the store counter. Several items at the scene were collected and tested. Coins amounting to $1.83 were left on the counter. According to Sergeant LeBlanc, a shirt by the carwash stalls was collected, and she was involved in the collection of the Buick that was reflected in the four photographs shown to Mr. Green. Sergeant LeBlanc further explained:

> A.     On that particular day, the U.S. Marshals Task Force, we contacted them to help us in locating Mr. Fisher. So they actually located him initially and contacted us to meet them in the area of Lafayette.
>
> Q.     They had located the vehicle?
>
> A.     Yes ma'am.
>
> Q.     In other words, had they made a stop of the vehicle at the time?
>
> A.     The way I understand it is is [sic] that they followed Mr. Fisher to the actual gas station and then they, at that point, that's when they did the take-down on Mr. Fisher.
>
> Q.     Okay, at that point y'all arrived?
>
> A.     Yes, ma'am.

20

Q. And y'all took that vehicle into evidence?

A. Yes, ma'am.

Sergeant LeBlanc indicated that the only person in the vehicle was Defendant. According to Sergeant LeBlanc, no weapon was located in connection with the crime. A digital video recording from the store was collected and sent to the Louisiana State Police Crime Lab, but no information could be retrieved from it.

Sergeant LeBlanc stated that she began looking for Mr. Lemon after speaking with Mr. Robins and Mr. Green, and that when the officers first went to Mr. Lemon's home, they were told that Mr. Lemon was not there and that his whereabouts were unknown. Sergeant LeBlanc indicated that the officers later learned that this information was not true. Mr. Lemon's relatives later went to the police station and told the officers what they knew, and Sergeant LeBlanc stated that, based on an anonymous tip, the officers learned that Mr. Lemon was in Arkansas. She thereafter drove to Arkansas to find Mr. Lemon, two days after the shooting.

Sergeant LeBlanc first became aware of Defendant's involvement after talking with Mr. Lemon. Defendant was arrested on January 9, 2016, in a vehicle registered to Defendant's fiancé, Peaches Jean Batiste. The vehicle was a Buick Rendezvous. According to Sergeant LeBlanc, Defendant said he was 6'2".

On cross examination, Sergeant LeBlanc agreed there were inconsistencies in Mr. Lemon's statements to police. She further agreed that Mr. Lemon was the only person that said Defendant had some involvement with the murder. However, there were witnesses who said that there was a second person. Later, Sergeant LeBlanc added that Mr. Green had given a description of a vehicle that matched a vehicle belonging to Defendant's fiancé. Sergeant LeBlanc indicated that

21

Defendant had told her that Mr. Lemon had tried to call him. She further agreed that Mr. Lemon appeared to be afraid during his interview in Arkansas.

On re-direct examination, Sergeant LeBlanc stated that Defendant's fiancé told them Defendant dropped her off at work and did not pick her up until 9:00 p.m. The following colloquy occurred regarding the inconsistencies in Mr. Lemon's statement:

> Q.     Mr. Willis asked you was Mr. Lemon's statement inconsistent? In the course of questioning a witness, is it unusual for them to sort of start off, sort of constrained and then open up as you go along?
>
> A.     Yes, ma'am.
>
> Q.     Is that necessarily an inconsistency?
>
> A.     Not necessarily.
>
> Q.     After he was evaluated and questioned all those different times, you felt you had made a decision about his credibility, right?
>
> A.     Yes, ma'am.
>
> Q.     And what was significant of the things that he may have characterized as inconsistent or not, and we can get into all that later, what was important - - but all that, you had the opportunity to evaluate all that firsthand, right?
>
> A.     Yes, ma'am.
>
> Q.     At that point, when you were finished with all of those multiple interviews, you had a strong sense of what you felt of the truth or the lack of truth in what he was telling you?
>
> A.     Yes, ma'am.
>
> Q.     In connection with that, you did continue to investigate the matter, based on some information he provided you?
>
> A.     Yes, ma'am.
>
> Q.     And some of that information, very specific information, led you straight to Mr. Fisher.
>
> A.     Yes, ma'am.

According to Sergeant LeBlanc, Mr. Lemon had identified Defendant in a photo lineup. Defense counsel also questioned Sergeant LeBlanc about a man

22

named Mr. Al Lyons, and Sergeant LeBlanc stated Mr. Lyons was not a suspect and had never been identified as the shooter. At some point, a suggestion had been made that Mr. Lyons had control of the vehicle spotted near the scene and that he was the person who handed a shirt to Mr. Lemon. No DNA reference sample was taken from Mr. Lyons.

Defendant's fiancé, Peaches Jean Batiste, also testified at trial. She had been engaged to Defendant for one and a half years. She stated that, on the day of the shooting, she drove herself to work at 5:00 p.m. in a beige Buick Rendezvous. She noted that while she was at work on that date, Defendant used her vehicle and was supposed to pick her up at 9:00 p.m. Ms. Batiste identified the vehicle shown in State's Exhibit 7 as her vehicle, the same vehicle used by Defendant on the day of the shooting.

State Trooper Frank Garcia collected a phone belonging to Defendant in connection with the investigation of the shooting. Trooper Garcia performed a forensic examination of Defendant's phone. According to Trooper Garcia, Mr. Lemon's phone number did not appear in the examination of Defendant's phone.

The sole witness to testify for Defendant was his mother, Donna Fisher. Ms. Fisher testified that Defendant arrived at her house on the day of the shooting between 5:15 p.m. and 5:20 p.m. and left about 8:00 p.m.[8] Ms. Fisher implied that Defendant was dropped off at her house because she did not see a vehicle when she opened the door for him. According to Ms. Fisher, Defendant went to the store for her around 6:15 p.m. or 6:20 p.m.

**Defendant's Argument in Brief**

Defendant argues that the evidence was insufficient to convict him because there was no physical evidence linking him to the murder. He notes that Mr. Lemon was the only person who was independently verified to be at the store at or

---

[8] Ms. Fisher testified that she lived at 530 S. Liberty Street in Opelousas. As previously stated, Mr. Lemon testified that he passed Ms. Fisher's house on his way to the store.

near the time of the shooting. Additionally, Defendant notes that no motive was ever established for the shooting. Finally, Defendant argues that Mr. Lemon's actions after the shooting were more indicative of guilt than Defendant's actions and that Mr. Lemon's testimony contained many inconsistencies stating:

> Mr. Lemon demonstratively lied to the jury during his testimony, his direct and cross examination testimony demonstrate this. On cross examination Mr. Lemon made a concerted stand about the fact that he heard Jeffery yell at him not to tell anybody anything when he first *exited* the store. *See* (R. at 492-93, 539) (Mr. Lemon testifying on cross that Jeffery's statements were allegedly made before he was in the vehicle—"when he was in the vehicle, he ain't said nothing"). However, on direct examination, he expressly contradicted this testimony by saying he was running down "Liberty Street . . . . I was running then like I stopped to see who it was, . . . then I see like the car passed and it was him, then I started running again, like I didn't want to show nobody I was scared. *Then* he was just saying, '[…], you better not tell,' . . . ." (R. at 446-47) (emphasis added); *see also* (R. at 136) (Lead Detective's testimony at preliminary hearing that Mr. Lemon told police the alleged threat not to tell anyone was said *from a vehicle* while Mr. Lemon was running).

### State's Argument in Brief:

The State argues that Defendant's allegation rests entirely on challenging the credibility of State witnesses, a function which must be left to the discretion of the trier of fact. In its closing argument at trial, the State acknowledged that no physical evidence linked Defendant to the shooting. To support the jury's decision to believe Mr. Lemon, the State argues the following:

> There are many factors that substantiate the jury's positive credibility determination of Mr. Lemon. First, and most importantly, Mr. Lemon was told when he [was] arrested that there was a video of the murder on Bikini Betty's camera system. He testified that he was never told otherwise whether the cameras worked or not. So, Mr. Lemon believed there was a video of the murder. (Vol. III, p. 524.) Moreover, every interview provided by Mr. Lemon was recorded, and all interviews were played for the jury in their entirety so they could judge Mr. Lemon's consistency for themselves. Additional factors also corroborated Mr. Lemon's testimony. Mr. Lemon testified that the Defendant handed him a jacket in the parking lot, and Mr. Robbins [sic] corroborated. Furthermore, although Dr. Tape could not make an expert opinion as to the height of the shooter, he could testify that the bullet that killed the victim traveled a straight path from entry to exit through the victim's forehead. The victim was approximately 5'10 and standing on a riser behind the counter; Mr. Lemon is

24

approximately 5'4, and the Defendant is approximately 6'2. Again, it could not be definitively stated in an expert opinion, but it is still a factor to consider when assessing the evidence that the victim would have had to be leaning down or Mr. Lemon standing on a chair for the bullet to take a direct path through the victim's forehead based on the heights of the victim and Mr. Lemon to believe Mr. Lemon shot the victim. It is more plausible that a 6'2 individual shot the 5'10 victim while the victim was standing on a riser. Also, the Defendant's fiancé confirmed that the Defendant was using her vehicle while she was at work, and she identified her vehicle as being the same one seen by Mr. Green and Mr. Lemon at the scene. Mr. Lemon stated the Defendant appeared to be in the vehicle when it passed Mr. Lemon after the shooting. Defendant also attempts to argue about the motive for the shooting, which is not a necessary element of proof. Notwithstanding, Defendant hypothesizes that Mr. Lemon must have shot the victim in order to steal the candy. Mr. Lemon testified that he had enough change to pay for the candy and was at the counter attempting to pay when the Defendant shot the victim. This fact is corroborated by the change found on the counter and underneath the victim's body at the scene.

## Jurisprudence and Analysis

This court has stated the following regarding the jury's choice to believe eyewitness testimony:

> Because it is the role of the jury as the factfinder to make credibility determinations, we will not question those determinations beyond the standard for evaluating the sufficiency of evidence outlined in *Jackson. See* [*State v.*] *Touchet*, [04-1027 (La.App. 3 Cir. 3/6/05),] 897 So.2d 900. "A victim's or eyewitness's testimony alone is usually sufficient to support a verdict." *State v. Davis*, 02–1043, p. 4 (La.6/27/03), 848 So.2d 557, 559; *State v. Hills*, 99–1750, p. 8, n. 8 (La.5/16/00), 761 So.2d 516, 522.

*State v. Dossman*, 06-449, 06-450, p. 8 (La.App. 3 Cir. 9/27/06), 940 So.2d 876, 882, *writ denied*, 06-2683 (La. 6/1/07), 957 So.2d 174.

In another case, this court stated:

> This case involves a matter of credibility for the jury to decide. Under the jurisprudence, it is not this court's role to second-guess the jury's assessment. "Credibility assessments are within the province of the fact-finder, in this case the jury." *State v. Hypolite*, 04–1658, p. 5 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, 1279, *writ denied*, 06–618 (La.9/22/06), 937 So.2d 381. A jury may "accept or reject, in whole or in part," any witness's testimony. *Id.* (citing *State v. Silman*, 95–154, p. 12 (La.11/27/95), 663 So.2d 27, 28). We will "overturn a jury's credibility assessment only when a witness's own testimony demonstrates that the witness's ability to perceive events was impaired in some way." *Hypolite*, 903 So.2d at 1279.

25

*State v. Bethley*, 12-844, p. 4 (La.App. 3 Cir. 2/6/13), 107 So.3d 834, 838, *writ denied*, 13-570 (La. 8/30/13), 120 So.3d 263.

Finally, this court has stated the following about a conviction supported by a single witness's testimony:

> Furthermore, it is well-settled jurisprudence that the testimony of a single witness is sufficient to support a conviction, absent internal contradictions or irreconcilable conflicts with physical evidence, even where the State does not introduce medical, scientific, or physical evidence. *State v. Williams,* 14–882 (La.App. 5 Cir. 5/14/15), 170 So.3d 1129. The credibility of the witness is a matter of weight, and not sufficiency, of the evidence, and the determination of credibility is left to the trier-of-fact's sound discretion and will not be re-weighed on appeal. *State v. Dixon,* 04–1019 (La.App. 5 Cir. 3/15/05), 900 So.2d 929; *State v. Hawkins,* 99–217 (La.App. 5 Cir. 7/2/99), 740 So.2d 768.

*State v. Navarre*, 15-920, p. 2 (La.App. 3 Cir. 4/6/16), 188 So.3d 478, 480, *writ denied*, 16-800 (La. 5/1/17), 220 So.3d 742.

In the present case, the jury was able to evaluate Mr. Lemon's identification of Defendant as the shooter in light of his prior interviews, his cross-examination by defense counsel, and the lack of physical evidence linking Defendant to the crime. The jury obviously chose to believe Mr. Lemon. Although Mr. Lemon offered differing testimony as to whether Defendant threatened him from inside of a vehicle, and Mr. Lemon delayed telling police about seeing Defendant prior to the shooting, Mr. Lemon's identification of Defendant as the shooter was consistent.

Mr. Robins corroborated Mr. Lemon's testimony to some extent by stating that he saw Mr. Lemon running after the shooting. Mr. Robins also saw someone give Mr. Lemon a sweater, someone he believed could have been Defendant. Moreover, Defendant's own mother (Ms. Fisher) put Defendant in the vicinity of the shooting by stating that Defendant was at her house between 5:15 p.m. and 8:00 p.m. on the day in question. Considering Mr. Lemon's testimony that he

walked in front of Ms. Fisher's house on his way to the store, Ms. Fisher lived within walking distance of the shooting. According to Ms. Fisher, Defendant went to the store for her around 6:15 p.m., and Sergeant LeBlanc testified that the shooting was reported at 6:22 p.m. Finally, Defendant was arrested while driving a vehicle that matched the description of a vehicle spotted near the shooting. Based on Defendant's own fiancé's testimony, Defendant was driving the vehicle on the night of the shooting. Considering this evidence, we find Defendant fails to show the jury's credibility determination was not rational.

Accordingly, this assignment of error lacks merit.

## CONCLUSION

For the reasons stated above, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.

27